**Carl PETTIJOHN, Petitioner, Appellant,**

v.

**Frank HALL, Respondent, Appellee.**

**No. 78–1420.**

United States Court of Appeals, First Circuit.

Argued March 14, 1979.

Decided June 7, 1979.

Jack A. Goetz, Boston University Law Student, with whom John Leubsdorf, Associate Professor of Law, Boston, Mass., Court appointed counsel, and Judd H. Lees, Boston University Law Student, were on brief, for appellant.

Robert V. Greco, Asst. Atty. Gen., Boston, Mass., with whom Francis X. Bellotti, Atty. Gen., and Stephen R. Delinsky, Asst. Atty. Gen., Chief, Criminal Bureau, Boston, Mass., were on brief, for appellee.

Before COFFIN, Chief Judge, BOWNES, Circuit Judge, PETTINE, District Judge.*

PETTINE, District Judge.

This habeas corpus appeal concerns the scope of the sixth amendment right to call a witness in one's defense after having moved to suppress a portion of that witness' testimony.

A brief recitation of the facts is necessary. Carl Pettijohn was convicted of armed robbery in Massachusetts Superior Court solely on the basis of the victim's eyewitness testimony. David Smith, the victim, had been a security guard for the New England Wholesale Drug Company for approximately two weeks. On the afternoon of September 8, 1975, Smith was walking through the company parking lot and responded to the beckoning of a man he later identified as Pettijohn. He was somewhat familiar with Pettijohn, having seen him in the neighborhood a few times. When Smith drew near, the man identified as Pettijohn exposed two handguns stuffed in his pants. Simultaneously a second man appeared at Smith's right, threatening Smith and ordering him to cooperate. Pettijohn then removed Smith's weapons and told Smith that he would be released only if he forgot his assailant's face.

The next morning, Smith picked out a picture of Pettijohn from a group of nine police photographs and identified him as the robber.

Frank Griffin, the manager of the drug company was also an eyewitness to the robbery, which he observed from the first floor window of the Company's building some forty feet away. He immediately ran to get his gun, and by the time he had rushed out of the building to aid Smith, Smith was returning and Griffin could see only the backs of the fleeing robbers.

Griffin, who had worked at the company longer than Smith, was familiar with Pettijohn and the other boys living in the neighborhood. In fact, Griffin knew Pettijohn by his nickname "Bunny", while Pettijohn called Griffin "Big Al".

The next morning, the police also showed Griffin a group of nine photographs. Again a picture of Pettijohn was amongst the photographs. The police had inserted the picture because Pettijohn fit the various descriptions of the robber. The police officer had also heard Smith or Griffin mention Pettijohn's name. At some point, Griffin told the police officer that he knew the culprit by the name of "Bunny", but the record provides no clue as to whether he did this before or after inspecting the photographs. The government asserts that Griffin positively identified Pettijohn as the robber prior to his review of the photo-

* Of the District of Rhode Island, sitting by designation.

graphs. However, this is a rather strained interpretation of the record in light of Griffin's questionable ability to independently identify Pettijohn at a later suppression hearing.

Despite this confusion in the record, there is no doubt that Griffin encountered serious difficulty when he attempted to identify the robber from the set of nine police photographs. Griffin narrowed the selection down to what the trial judge later described as two "remarkably similar" photographs: one was a photograph of Pettijohn, the other a photo of another man. Griffin selected the picture of the other man and stated, "I think that's him". The police officer replied, "No it's not". Not surprisingly, Griffin then selected the remaining photograph which depicted Pettijohn and stated, "It's definitely that one". The police officer confirmed this second choice with the words, "That's him".

Prior to trial, the defendant moved to suppress the photographic identifications of both Smith and Griffin. At the suppression hearing, Griffin expressed some doubt as to whether he could independently identify Pettijohn as the robber without relying upon the previous photographic display. Before Griffin was excused from the suppression hearing, Pettijohn's lawyer requested that Griffin be available "as a possible defense witness during the course of the trial". The trial judge ruled that Griffin's eventual identification of Pettijohn was inadmissible due to the impermissibly suggestive police tactics. Any in-court identification by Griffin of Pettijohn was also considered tainted by the police practices and, thus, declared inadmissible. The trial judge declined to suppress Smith's identification.

At trial the prosecution rested solely upon Smith's identification of Pettijohn. In an effort to counter Smith's damaging identification, the defense sought to call Griffin as a witness and introduce his prior identification of another man. The court ruled against these efforts, finding that Griffin's testimony was irrelevant and inadmissible for the purpose of impeaching Smith's identification. Counsel then stated that impeachment was not the only purpose of the testimony; he also wished to call Griffin "as a witness for the defendant for the purpose of showing his identification of a person other than the defendant". After being rebuffed by the judge, counsel again attempted to clarify his offer of proof by stating that, "I would call Griffin for the purposes of the defendant's right to present evidence in his defense. . . ." The court reiterated its ruling that the testimony was "inadmissible because it's not material and not relevant."

On appeal, Pettijohn argued that he had a right to waive his success on the motion to suppress and that, under the sixth amendment right to present "witnesses to establish a defense", as articulated in *Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967), he was constitutionally entitled to call Griffin to show that Pettijohn was not the robber. The appeals court held that the trial judge did not abuse his discretion because

> it was clear from the testimony given by Smith and Griffin at the hearing on the motion to suppress . . . that there were substantial differences between the respective opportunities of the two witnesses to observe and recollect the facial characteristics of the robber. *Contrast Commonwealth v. Franklin*, [366 Mass. 284], 318 N.E.2d 469 (1974).

*Commonwealth v. Pettijohn*, 351 N.E.2d 535 (Mass.App.Ct.1976).

In evaluating the relevancy of Griffin's testimony by contrasting it to Smith's, the Appeals Court apparently was only concerned with whether Griffin's testimony was sufficiently relevant and reliable to impeach Smith's testimony. The Appeals Court's focus upon the issue of impeachment is displayed by their citation of *Commonwealth v. Franklin, supra*, a case involving impeachment of a government witness.

The Massachusetts Supreme Judicial Court also upheld the evidentiary exclusion; again, the issue of relevancy was addressed solely in relation to impeachment:

In essence, the defendant asserts the right to impeach the witness Smith by showing that the witness Griffin was mistaken in his first attempt to select a picture of the person known to him as "Bunny." We fail to see the relevance of Griffin's mistake on the issue of Smith's credibility or reliability. In these circumstances the judge was clearly warranted in ruling, as he impliedly did, that the testimony of Griffin had little, if any, probative force for the defense. Nor do we agree that there was any Federal constitutional right under the Sixth Amendment, as argued by the defendant, to present evidence which was not probative, and hence not relevant. *Cf. Washington v. Texas*, 388 U.S. 14, 16–23, 87 S.Ct. 1920, 18 L.Ed.2d 1019 (1967). *Commonwealth v. Franklin*, 366 Mass. 284, 318 N.E.2d 469 (1974), relied on by the defendant is distinguishable. . .

*Commonwealth v. Pettijohn*, 364 N.E.2d 1070, 1073–74 (1977).

This analysis failed to consider the issue of the defendant's right to introduce a witness in his own defense; *i. e.*, using Griffin's testimony to establish that another man was the robber and was identified as such by an eyewitness. The relevance of this affirmative evidence was never addressed.

In the last paragraph of the opinion, the Massachusetts Supreme Judicial Court apparently did acknowledge that defendant wished to introduce the witness not solely for impeachment purposes but also "as part of his [the defendant's] case".[1] The court, however, felt that introduction by the defendant of evidence previously suppressed might produce "a tactical advantage unfair to the Commonwealth" that could not be overcome with special jury instruction. *Commonwealth v. Pettijohn, supra*, at 1074.

Defendant's brief supporting his habeas corpus petition in federal district court was no paradigm of clarity, but it did reassert that a dominant purpose for Griffin's testi-

mony was to raise "a feasible defense that the jury should have had an opportunity to consider."

In the federal court, Magistrate Cohen, who originally considered the petition, stated that evidence of Griffin's initial identification "was proffered solely for the purpose of impeaching Smith." He recognized that the Massachusetts Supreme Judicial Court had ruled such testimony irrelevant for the purpose of impeachment. Having framed the issue in this fashion, the Magistrate could easily find that the constitutional right to present evidence in a defendant's behalf "is limited to evidence which is '*relevant* and *material* to the defense'. *Washington v. Texas*, 388 U.S. 14, 23 [, 87 S.Ct. 1920, 18 L.Ed.2d 1019] (1967) (footnote omitted) (emphasis added)." He concluded that the exclusion of irrelevant matter was not constitutional error.

Chief Judge Caffrey adopted the recommendation of the Magistrate and concluded:

it is settled law in any event that the admission or rejection of evidence normally does not raise a question of constitutional dimension cognizable in a federal habeas corpus. This is true *a fortiori* where that type of evidence has been ruled immaterial under state law, and such is the case herein.

As a matter of abstract constitutional doctrine, Judge Caffrey's holding cannot be doubted. There is a critical fault in this analysis, however, as it applies to this case. The state court's ruling of relevancy focused on impeachment, not upon the use of the evidence to present a direct defense upon one's behalf.

The state courts never considered the relevancy of Griffin's testimony as it related to raising the direct defense that another man, with remarkably similar characteristics, committed the crime. It is elementary that the purpose for which the evidence is offered is often determinative of its relevancy. So it is in this case.

---

1. The court assumed without deciding that the defendant could waive his right to suppress the evidence. *Commonwealth v. Pettijohn*, 364 N.E.2d 1070, 1073 (1977). This assumption was fully warranted. *See* note 3 *infra*.

As the Massachusetts courts held, Griffin's first allegedly mistaken selection of a picture had little bearing upon Smith's credibility or reliability. In terms of impeachment, Griffin's change of mind is logically connected with the reliability of his own identification, not Smith's. Therefore, for the purpose of impeachment, Griffin's testimony was irrelevant.

 In contrast, Griffin's testimony was clearly relevant for the purpose of direct testimony to establish a defense. Pettijohn desired to establish a sound defense by introducing evidence supporting an alternative rendition of the facts. Griffin's testimony concerning his initial identification was critically relevant for this task. Griffin knew Pettijohn well enough to exchange nicknames upon meeting and had the opportunity to observe the robbery from forty feet. Pettijohn wished to show that, despite this familiarity and opportunity to observe, Griffin identified another man as the culprit before the police practiced admittedly suggestive tactics. Even if the record is interpreted as showing that Griffin thought he initially had seen Pettijohn in the parking lot, his choice of someone else's photograph is strong evidence that his initial identification was incorrect and that some other person was in fact the robber. The Supreme Court has recognized the importance of such exculpatory evidence:

> Selection of the picture of a person other than the accused . . . will be useful to the defense in precisely the same manner that the selection of a picture of the defendant would be useful to the prosecution.

*United States v. Ash*, 413 U.S. 300, 318–19, 93 S.Ct. 2568, 2578, 37 L.Ed.2d 619 (1973). *See also Grant v. Alldredge*, 498 F.2d 376, 379 (2d Cir. 1974). Such exculpatory evidence gains importance in the context of this case. Besides the victim, Griffin was the only eyewitness to the crime. The central issue was one of identification. Evidence that someone other than the defendant was identified as the criminal is not only probative but critical to the issue of the defendant's guilt. *See, e. g., United States v. Robinson*, 544 F.2d 110, 112–13 (2d Cir. 1976); *Commonwealth v. Graziano*, 368 Mass. 325, 329–30, 331 N.E.2d 808 (1975). The prior identification could not have been more relevant and material to Pettijohn's defense; he could support his version of the event in no other way. In the context of a criminal trial, the sixth amendment severely restricts a trial judge's discretion to reject such relevant evidence.[2] Exclusion of relevant exculpatory evidence infringes upon the fundamental right of an accused to present witnesses in his own defense. The right of compulsory process in state courts is well established:

> The right to offer the testimony of witnesses, and to compel their attendance, if necessary, is in plain terms the right to present a defense, the right to present the defendant's version of the facts as well as the prosecution's to the jury so it may decide where the truth lies. Just as an accused has the right to confront the prosecution's witnesses for the purpose of challenging their testimony, he has the right to present his own witnesses to establish a defense. This right is a fundamental element of due process of law.

*Washington v. Texas*, 388 U.S. 14, 19, 87 S.Ct. 1920, 1923, 18 L.Ed.2d 1019 (1967). This right gains special importance when the evidence is critical to the accused's defense. *Chambers v. Mississippi*, 410 U.S. 284, 302, 93 S.Ct. 1038, 35 L.Ed.2d 297 (1973).

---

**2.** We are particularly free in this case to review the trial judge's evidentiary ruling because our decision does not contradict the basis upon which the judge made his discretionary decision. During the pressures of the trial the judge apparently made his evidentiary ruling solely in terms of the relevancy of the testimony for impeachment purposes. The various appellate courts also framed the evidentiary issue in this fashion and overlooked the sixth amendment right to present witnesses in one's own defense. Therefore, we are not treading on a state trial judge's discretion; rather, we are reaching an issue clearly preserved on the record, yet bypassed by the trial and appellate courts.

■ Once a sixth amendment right is implicated, the state must offer a sufficiently compelling purpose to justify the practice. Various state evidentiary rules which advanced legitimate state interests have bowed to the defendant's right to let the jury hear relevant evidence. *See, e. g., Washington v. Texas, supra* (state interest in avoiding perjured testimony did not justify its rule barring co-conspirators from testifying); *Chambers v. Mississippi, supra* (state law excluding third party hearsay confessions did not justify exclusion). *Cf. Davis v. Alaska,* 415 U.S. 308, 94 S.Ct. 1105, 39 L.Ed.2d 347 (1974) (confrontation right prevails over juvenile proceedings privilege statute); *United States v. Nixon,* 418 U.S. 683, 709, 94 S.Ct. 3090, 41 L.Ed.2d 1039 (1974) (executive privilege yields to need for criminal evidence). The reasons offered for exclusion in this case are likewise insufficient.

None of the purposes offered by the Commonwealth of Massachusetts justify the infringement upon Pettijohn's right of compulsory process. A rational juror might well consider Griffin's first identification unreliable in light of his subsequent retraction. If the Supreme Court cases of *Washington v. Texas, supra,* and *Chambers v. Mississippi, supra,* mean anything, it is that a judge cannot keep important yet possibly unreliable evidence from the jury. In addition, Griffin's testimony does reveal characteristics of reliability. Griffin observed the crime from a relatively close and protected area, and his first photographic identification was made free of any suggestive police practices. Griffin's later repudiation of the initial identification might affect the weight of the evidence but not its admissibility. This later change of heart hardly makes the initial identification patently unreliable. A juror could well decide that the subsequent repudiation was due to suggestive police practices and, thus, less reliable than the first identification.

■ Once a defendant attempts to introduce testimony that is intimately interrelated with previously suppressed testimony, the defendant waives his objections to the introduction of that related evidence. *See Lawn v. United States,* 355 U.S. 339, 78 S.Ct. 311, 2 L.Ed.2d 321 (1958); *United States v. Carter,* 422 F.2d 519 (6th Cir. 1970). Therefore, a jury receives a full and balanced rendition of the facts because the prosecution is able to introduce the subsequent retraction and identification on cross-examination.[3] Because neither identification was patently unreliable, the jury can weigh the subsequent recantation, the remarkably similar photographs, and the circumstances surrounding Griffin's observation of the crime and then decide which identification was the more accurate. Determining which identification was correct was the open question at the heart of petitioner's defense. In a criminal trial, the jury must be presented with this question and allowed to answer it.

■ This conclusion is supported by Massachusetts practice. Massachusetts allows an out-of-court identification, which is later recanted, to constitute the basis of a criminal conviction. *Commonwealth v. Vitello,* 381 N.E.2d 582, 599 (1978). If a recanted identification is sufficiently reliable for prosecutorial use, the state cannot claim that it is too unreliable when offered by the defendant. A core purpose of the sixth amendment is that the defendant has the same rights to introduce evidence as the prosecution. 8 Wigmore, Evidence sec. 2191 (McNaughton rev. 1961). Justice Harlan's words are particularly relevant:

> This is . . . a case in which the State has recognized as relevant and competent the testimony of this type of witness, but has arbitrarily barred its use by

3. The petitioner readily concedes that the exercise of his right to introduce Griffin's testimony waives his rights in suppressing Griffin's other identifications. Without such rebutting evidence, the jury might be unduly influenced by Griffin's initial photographic identification. Massachusetts recognizes such a waiver: "The

defendant lost the benefit of the earlier order suppressing evidence of the events of that evening by insisting that his counsel question him about those events." *Commonwealth v. Redmond,* 357 Mass. 333, 341, 258 N.E.2d 287, 293 (1970).

the defendant. This, I think, the Due Process Clause forbids.

*Washington v. Texas*, 388 U.S. at 25, 87 S.Ct. at 1926 (concurring).

The Massachusetts Supreme Judicial Court noted that introduction of the evidence would provide the defendant with an "unfair tactical advantage". The court apparently felt that allowing the defendant to introduce the initial identification and placing the government in a rebutting role would unfairly prejudice the government. Conceivably jurors might conclude that the government had withheld this line of questioning from their own case due to its damaging nature. We find this reasoning unpersuasive. The creation of any unfair inference in the jurors' minds appears very speculative. During cross-examination, the government could fully develop Griffin's repudiation and second identification. Despite the contentions of the Massachusetts Supreme Judicial Court, a judge could construct a jury instruction which fully explained why the evidence was introduced in that order. Even if a tactical disadvantage was created, the government cannot complain for it was government misconduct that prohibited their direct introduction of Griffin's testimony. A contrary result would turn the exclusionary rule on its figurative head; the accused, not the prosecution, would be prohibited from producing a witness and penalized for police misconduct.

Allowing the defendant to introduce the first identification and permitting the government to rebut with previously suppressed evidence did result in some circuitous inefficiency. The circular scenario of suppression, waiver of suppression, and eventual introduction of the tainted testimony would have been avoided had defendant initially never moved to suppress the evidence. The motion to suppress, however, should not be construed as a waiver of defendant's sixth amendment right of compulsory process.

There is no evidence that the defendant, through his counsel, chose to waive the right to compulsory process. On the contrary, the defendant clearly expressed his desire not to waive his sixth amendment right to call Griffin. Before the motion to suppress was acted upon, the defendant indicated to the judge that he might call Griffin as a defense witness.

This conditional request was totally proper and understandable considering the dilemma Pettijohn faced. He had moved to suppress the testimony of both eye-witnesses. When the testimony of only one witness was suppressed, Pettijohn was in need of the now-suppressed witness to counteract the victim's admissible testimony. Recognizing this situation, the defendant's timely request to call Griffin in his own defense was the most feasible method of preserving his sixth amendment right.

■ The defendant had not waived his right to elicit such a relevant and vital testimony in his defense. The exclusion of such testimony prohibited the defendant from presenting witnesses in his favor.

■ Despite appellee's failure to argue the issue in any detail, we have considered the applicability of harmless error doctrine to this case. While it may be possible that erroneous exclusion of a defendant's evidence could be harmless beyond a reasonable doubt, *Chapman v. California*, 386 U.S. 18, 87 S.Ct. 824, 17 L.Ed.2d 705 (1967), we do not think this is such a case. In a case where identification of the robber was the key issue, exclusion of such identification testimony was necessarily harmful error. Pettijohn could only support his assertion that another man was the culprit by introducing Griffin's testimony. Showing the jury that an eyewitness identified another man was the robber when confronted with photographs would have created a plausible defense. The jury could find either that Griffin truly did observe a different individual commit the crime or that Griffin's differing identifications revealed how unreliable any identification of Pettijohn was. Either of the two theories derived from Griffin's identification of another man as the culprit could have significantly swayed a jury charged with finding guilt beyond a reasonable doubt. The right to present

such a vital witness as Griffin is, at heart, the right to present a defense. No matter how credible this defense, our system of justice guarantees the right to present it and be judged by it.

The writ of habeas corpus shall issue unless the Commonwealth of Massachusetts makes arrangements for a new trial within 90 days.