

2003 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

11-18-2003

# USA v. Lawrence

Precedential or Non-Precedential: Precedential

Docket No. 02-3340

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_2003

Recommended Citation

"USA v. Lawrence" (2003). *2003 Decisions.* Paper 80.
http://digitalcommons.law.villanova.edu/thirdcircuit_2003/80

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 2003 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

PRECEDENTIAL

Filed November 13, 2003

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 02-3340

UNITED STATES OF AMERICA

v.

DION LAWRENCE,
                    Appellant

On Appeal from the District Court
of the Virgin Islands
(Criminal Action No. 00-CR-00654)
District Judge: Hon. Thomas K. Moore

Argued: April 29, 2003

Before: ROTH, McKEE and COWEN, *Circuit Judges.*

(Opinion Filed: November 13, 2003)

KIRSTEN GETTYS DOWNS, ESQ.
 (Argued)
Assistant Federal Public Defender
THURSTON T. McKELVIN, ESQ.
Federal Public Defender
P.O. Box 1327, 51B Kongens Gade
Charlotte Amalie, St. Thomas,
 USVI 00804
*Attorney for Appellant*

SARAH L. WEYLER, ESQ. (Argued)
Assistant United States Attorney
DAVID M. NISSMAN, ESQ.
United States Attorney
U.S. Courthouse,
 5500 Veterans Building,
 Suite 260
Charlotte Amalie, St. Thomas,
 USVI 00802-6924
*Attorneys for Appellee*

## OPINION OF THE COURT

McKEE, *Circuit Judge*.

Dion Lawrence challenges his conviction for first degree murder and related charges arising out of a fatal shooting on the island of St. Thomas, U.S. Virgin Islands. Lawrence argues that photographic arrays shown to government witnesses were unduly suggestive, that the trial court erred in granting the government's motion *in limine* to exclude evidence that the victim identified someone else as his assailant, and that the evidence was insufficient to prove the premeditation required for first degree murder. In addition, in a matter of first impression in this circuit, Lawrence argues that the government failed to establish that the weapon involved was not an antique and therefore not a "firearm" within the meaning of 18 U.S.C. §§ 922(g) and 924(c)(1), (j)(1). For the reasons set forth below, we reject each of Lawrence's arguments, and we will affirm his convictions on the charges set forth in the indictment.

## I. BACKGROUND

Lawrence was convicted of murder in the first degree in violation of 14 Virgin Islands Code (V.I.C.) § 922(a)(1); possession of a firearm as an illegal alien in violation of 18 U.S.C. § 922(g); and use of a firearm during and in relation to a crime of violence in violation of 18 U.S.C. §§ 924(c)(1) and (j)(1). The convictions stemmed from the April 22, 2000 shooting of George "Josh" Hodge, Jr.

On the day of the shooting, Hodge was in the Boat Bar on Coki Point Beach, St. Thomas, sitting a few feet away from Kenneth Harrigan. Hodge was wearing several gold necklaces that day, as was his custom. Harrigan later testified that a man known to him as "Trini" approached and asked for some marijuana. Harrigan told Trini he had none, and a few minutes later Trini walked away. However, he returned about 15 minutes later and asked Harrigan for some rolling paper, which Harrigan gave him. Trini then "rolled" a "cigarette" of tobacco and marijuana and smoked it. When he finished, Trini told Harrigan: "This is nothing personal. Don't take this personal." Trini then grabbed Hodge by the belt saying: "It's you I come for." Trini then pulled out a gun and shot Hodge. As Harrigan ran from the scene, he saw Trini fire a second shot, and then heard a third shot before leaving the scene and seeing Trini run away.

Karl Frederiksen and Tynisha Martin were on the beach about 50 feet from Harrigan and Hodge, facing away from them when the shooting occurred. Frederiksen saw a man he knew as "Tall Boy" talking and smoking near Hodge. Frederiksen was looking in the direction of the Boat Bar at the time of the shooting because he heard Hodge yelling, and saw Tall Boy with at least one of Hodge's gold necklaces in his hand and a gun in his other hand. Frederiksen heard three shots, and saw Hodge hold on to his gold chains before falling to the ground. He then saw Tall Boy run away through some bushes with a stocking cap pulled over his face. Frederiksen then went to see if she could help Hodge.

Hodge spoke only briefly to a police officer who arrived on the scene. He told the officer that the shooter grabbed his gold Gucci chain and shot him. However, he gave no description, and said nothing else that was helpful to the ensuing investigation. When Hodge arrived at the hospital, doctors learned that he was paralyzed from the neck down and unable to speak due to his injuries and a subsequent tracheotomy.

Berenice Hodge, the victim's sister, arrived at the hospital the following day — April 23, 2000. Hodge tried to communicate with his sister, but communication was

exceedingly difficult because of Hodge's injuries, resulting paralysis and tracheotomy. He did, however, manage to say "Ogami," and when she repeated "Ogami" back to Hodge, he would nod his head "yes." Hodge also said "T." Berenice Hodge later informed two members of the Virgin Islands Police Department, including Sergeant Curtis Griffin, what her brother had said.

Hodge began to withdraw and become non-responsive after his first week of hospitalization. On May 20, 2000, he began bleeding through his nasogastric tube. That same day Police Officer Cordell Rhymer showed Hodge a photographic array assisted by a nurse. The nurses had developed a method of non-verbal communication with Hodge whereby he would blink and/or nod in response to questions. When Rhymer showed Hodge the photograph array, the nurse recorded on Hodge's chart that he blinked and nodded as if to select the fourth photograph. That was a picture of Dale "Ogami" Benjamin. Ogami was apparently on the beach when the shooting occurred. The defendant's photograph was not in the array.

On May 24, 2000, doctors had to operate on Hodge to control massive bleeding in his stomach. During the operation, the doctors determined that Hodge had an abscess in his abdomen and pockets of infection in other areas of his body. However, the peritonitis they had previously diagnosed appeared contained, and his condition improved enough for the hospital to make plans to apply for Medicare coverage for him on May 25. That day, several other police officers had Hodge again view a photo array. This time, Lawrence's picture was included as the fifth of the six pictures in the array. The officers asked Hodge if his assailant was pictured in the array, and they relied upon his non-verbal interactions to interpret his response.

The government subsequently argued that Hodge's blinks and nods in response to that inquiry were unresponsive to the officers' questions. However, the defendant would subsequently argue that Hodge's blinks and nods amounted to an identification of the person depicted in photograph number two as the assailant.

Hodge finally lost his battle to stay alive on May 30, 2000

after showing early signs of pneumonia and failing to respond to treatment for multiple organ failure. Thereafter, on May 31, 2000, Harrigan and Martin were separately shown the same array of photographs that Hodge viewed on May 25. Both identified Lawrence's picture as being a photograph of the person who shot Hodge. On a subsequent day, Frederiksen also identified the defendant as the shooter from the same array.[1]

As noted above, the photo array consisted of six pictures, and the pictures were all on the same page. The characteristics of those depicted in the array were based on information the police had previously gathered from Harrigan about the shooter. The picture of the defendant differed slightly from the other pictures in the array because (1) it was an informal picture taken by a friend, not a "mug shot," so that the angle was different; (2) the defendant wore a gold chain while the others pictured did not; (3) the defendant was the only person not wearing a shirt; and (4) the defendant was pictured with a more pronounced smile than anyone else.[2]

The defendant was arrested around June 13, 2000. One of the men arrested at the same time had a gold Gucci chain. Lawrence claimed the chain was his and asked police to give it to his wife. Berenice Hodge later testified that this chain was similar to chains worn by the victim.

Prior to trial, Lawrence filed a motion to suppress the photographic identifications by Harrigan, Frederiksen and Martin. He also asked the court to bar any in-court identification by any of those witnesses. Lawrence argued that the array was impermissibly suggestive and that any

---

1. The officer showing the photo array had each identifying witness sign his/her signature under the picture he/she selected as depicting the shooter. However, police used computer generated duplicate copies of the photo array so that no witness saw the signature of any other witness on any of the photos. In addition, no witness was told whether anyone else had identified any of the pictures in the photo array.

2. Although the defendant argues that he was the only one smiling in the photo array, the district court viewed the photo array and found that others were "showing teeth" though it does appear that the defendant's smile was more pronounced than anyone else's in the photo array.

subsequent in-court identification would therefore be tainted by the substantial likelihood of misidentification. Following a hearing in which the district court viewed the photo array and heard testimony regarding the circumstances surrounding the photographic identifications, the court denied the suppression motion. The court ruled that the array was not impermissibly suggestive because the individuals depicted in it had reasonably similar facial features and characteristics. The court also concluded that since each of the identifying witnesses had an unobstructed opportunity to observe the shooter before the incident without distraction, and since Frederiksen and Harrigan both knew Lawrence before the shooting, the likelihood of a misidentification from any undue suggestion of the photo array was very remote.

The government also filed a motion *in limine* to preclude the defendant from admitting testimony regarding Hodge's reference to "Ogami" when Hodge was shown the photographic array on May 20, and Hodge's identification of another person as the shooter in an array including Lawrence on May 25.[3] The government argued that the "identifications" constituted hearsay, and that they were also so ambiguous as to be meaningless. Lawrence responded by insisting that the identifications constituted dying declarations that were an exception to the hearsay rule. He also argued that the identifications met the standard of materiality under the residual hearsay exception.

The court granted the government's motion and ruled that Lawrence could not elicit evidence of Hodge's reference to "Ogami." The court held that neither identification constituted a dying declaration because the evidence did not establish that Hodge believed he was dying at the time of the declarations.[4] The court also ruled that the videotape

---

3. The defendant's motions to compel discovery and to dismiss the indictment were also considered at this hearing.

4. The court actually granted the government's motion pending additional evidence regarding the circumstances and probative value of Hodge's reference to Ogami. However, during the trial the court reaffirmed the ruling and prevented the defendant from alluding to Hodge's "identification" of Ogami.

recording of police presenting the photo array to Hodge on May 25 was too unreliable to be received into evidence. After viewing the recording during the hearing, the court reasoned that Hodge was uncommunicative and confused, and that any response he may have made to the photo array was too ambiguous to suggest that he was attempting to identify the shooter. The court also concluded that the May 20 identification in the presence of Officer Rhymer was not probative either because it was not clear whether Hodge was asked to identify his shooter or just identify persons who may have been on the scene and witnessed the shooting. Although Ogami was apparently present when Hodge was shot, there was no evidence to suggest he was the shooter except for the inference Lawrence tried to force from Hodge's inconclusive reaction to the photo array.

When Lawrence filed his witness list a few days before the trial, the government filed another motion to preclude several witnesses from testifying about Hodge's responses to the photographic arrays shown on May 20 and May 25. The government argued that the court had already prohibited the potential "identifications" Hodge purportedly made, and the same reasoning that compelled that ruling should preclude Lawrence's attempt to elicit the same testimony from others who were present when Hodge was shown the photo array. The court agreed and granted the government's motion.

Nevertheless, during cross-examination of a government witness and again during Lawrence's case-in-chief, defense counsel tried to elicit what Berenice Hodge said her brother told her at the hospital the day after the shooting. The court rejected the defendant's claim that these statements constituted excited utterances and ruled that they were hearsay that was not admissible as an "excited utterance" under Fed. R. Evid. 803(2).

Finally, during its case-in chief, the government presented testimony from an expert from the FBI crime laboratory who testified that bullet casings recovered from the scene of the shooting were from a .38 caliber firearm. However, he conceded on cross-examination that this type of bullet could have been fired from a firearm that had been

manufactured before 1898.[5] The government introduced the testimony of a second expert who also conceded on cross examination that the weapon that fired the .38 caliber bullet associated with the recovered casings could have been manufactured before 1898.

## II. DISCUSSION

### A. The Identifications

Lawrence argues that the district court erred in not suppressing evidence of the photographic arrays and the subsequent in-court identifications of the three government witnesses to the shooting. He claims that the array was unduly suggestive and prejudicial because: the photographs were displayed all on one page rather than serially, it was reproduced and shown to each witness with varying degrees of color distortion and shading; and Lawrence was the only one smiling, bare chested, and wearing jewelry. As noted, the witnesses said that Hodge's assailant stole some gold chains and that Lawrence had similar jewelry when he was arrested months after the shooting.

We review the district court's denial of Lawrence's suppression motion for an abuse of discretion. *In re Merrit Logan, Inc.*, 901 F.2d 349, 359 (3d Cir. 1990) ("The admission or exclusion of evidence is a matter particularly suited to the broad discretion of the trial judge.").

A due process violation can result when an identification procedure is so suggestive that it undermines the reliability of the resulting identification. Allowing a jury to consider an identification that is tainted by such a procedure can constitute reversible error entitling the defendant to a new trial. *Foster v. California*, 394 U.S. 440, 442 (1969); *see also Neil v. Biggers*, 409 U.S. 188, 196 (1972) (pre-trial identification of a defendant is inadmissible at trial if the identification was made at a confrontation that "was so suggestive and conductive to irreparable mistaken identification that the defendant was denied due process of law."). Accordingly, showing a witness a photographic array

---

5. We will explain the relevance of the 1898 date of manufacture below.

can constitute a denial of due process when police attempt to emphasize the photograph of a given suspect, or when the circumstances surrounding the array unduly suggest who an identifying witness should select. *Simmons v. U.S.*, 390 U.S. 377, 383 (1968). In evaluating the suggestiveness of a photographic array we examine the totality of the circumstances to determine whether the array's suggestiveness denied the defendant due process. *Neil*, 409 U.S. at 199. However, the defendant has the burden of proving that the identification procedure was impermissibly suggestive. *Reese v. Fulcomer*, 946 F.2d 247, 259 (3d Cir. 1991).

Here, the district court examined the entire array to determine if it was unduly suggestive and concluded that the defendant's photograph did not stand out and that the circumstances under which the array was presented did not suggest his identity to any of the witnesses. Although the array has not been made a part of the record on appeal, it is evident from the defendant's claims of error that the court did not abuse its discretion.

We can reject out of hand Lawrence's attempt to suggest that using an array consisting of six photographs reproduced on a single page as opposed to presenting individual pictures to witnesses serially would somehow prejudice a defendant. To the contrary, it appears to us that showing all of the photographs at once can be a very fair way to proceed depending on all circumstances surrounding the identification. Clearly, if the police had shown each photograph separately, an issue would arise about the defendant's place in the array. If his was the first photo shown, a defendant might argue that showing his/her photo first was unfair. Similarly, a defendant could argue that it is unfair to show his/her photo last, after a witness has been unable to identify anyone else.[6]

Moreover, it is undisputed that the distinguishing factors Lawrence argues regarding his photograph can, for the most part, be attributed to the fact that police had to use

---

6. We of course, take no position on the merits of such arguments. We merely state them in order to demonstrate the weakness of Lawrence's attempt to find fault with presenting photos all at once.

a personal photo of him. The other photos were "mug shots," and Lawrence states that their appearance suggested as much to the witnesses. However, we fail to see how that would prejudice a defendant. On the contrary, common sense suggests that a witness is less likely to identify a personal photo than one appearing to be a "mug shot" that would suggest a prior police record when witnesses are asked to select a picture of a murderer.

Although the defendant's photograph was apparently the only one depicting an individual not wearing a shirt and wearing jewelry and these factors may have made it "stand out," they are not sufficient, given the totality of circumstances here, to deny Lawrence due process because the circumstances establish the reliability of the identifications. As noted above, each of the government's witnesses had a clear, unobstructed opportunity to observe the shooting, and Harrigan even spoke to the assailant immediately before the shooting. All three witnesses had an opportunity to view the assailant at close range and nothing suggests that any of them had any trouble seeing the shooting. There was also an adequate opportunity to observe the shooter before any suggestion of violence when witnesses would not have been distracted or frightened, and powers of observation would not have been compromised by the fear or excitement that a shooting might generate. Harrigan and Fredericksen both had an opportunity to observe the assailant in the calm atmosphere that prevailed before the shooting. Most importantly, however, both of those witnesses knew Lawrence and had seen him on multiple occasions before the shooting. Given the totality of those circumstances, the district court clearly did not abuse its discretion in admitting the photographic identifications or allowing the witnesses to identify Lawrence in court.

### B.  The Court's Exclusion of Hodge's Purported Identifications

Lawrence claims that the district court also deprived him of due process of law because it excluded the videotape of Hodge's response to the array of photographs he viewed on May 25, 2000. Second, he argues that the court erred in

excluding Berenice Hodge's testimony about the victim's statements to her on April 23, 2000. In a related claim, Lawrence argues that the court also erred by failing to explain that ruling. Finally, Lawrence argues that the court deprived him of his Sixth Amendment right to confront witnesses against him by preventing him from using Berenice Hodge's testimony as impeachment evidence on cross-examination of a government witness.

We review the district court's exclusion of evidence for an abuse of discretion just as we reviewed the court's refusal to suppress evidence. *In re Merrit Logan, Inc.*, 901 F.2d at 359. We will address each claim in turn.

## 1. The May 25, 2000 Videotape

Lawrence argues that Hodge's response when shown the photo array on May 25 was admissible either as a dying declaration or under the residual hearsay exception. We disagree.

A declarant's statement identifying his/her assailant can be admitted as an exception to the hearsay rule if the declarant believes that he/she is facing imminent death. However, in order for this "dying declaration" to be admissible, the declarant "must have spoken with the consciousness of a swift and certain doom." *Shepard v. U.S.*, 290 U.S. 96, 100 (1933). Here, the district court concluded that Lawrence had not established that either of Hodge's "identifications" were made while Hodge believed death was imminent. The record supports that finding. Hodge's medical treatment was rigorous and undertaken with the expectation that he would survive. Hodge was never told by medical staff or police that he was going to die. Although Hodge had to realize that he had extremely serious injuries, doctors had been discussing the care he would need following his release from the hospital and the subsequent rehabilitation that everyone thought he would have to undergo. Moreover, when Hodge finally succumbed to his injuries on May 30, he had just recovered from major surgery and appeared on the way to recovery.

Moreover, he was shown the first array *five days before he died*. In addition, it is uncontested that not only did no

one tell Hodge he was going to die because his death was not expected, the nursing staff purposely tried to manifest an upbeat attitude around him to help keep his spirits up. Thus, the court correctly concluded that the evidence simply did not allow the foundation necessary to admit Hodge's purported identification of "Ogami" as a dying declaration.

Similarly, the response Hodge gave on May 25 lacks the necessary indicia of credibility to be admitted under the residual exception to the hearsay rule embodied in Fed. R. Evid. 807. That Rule states:

> A statement not specifically covered by Rule 803 or 804 but having equivalent circumstantial guarantees of trustworthiness, is not excluded by the hearsay rule, if the court determines that (A) the statement is offered as evidence of a material fact; (B) the statement is more probative on the point for which it is offered than any other evidence which the proponent can procure through reasonable efforts; and (C) the general purposes of these rules and the interests of justice will best be served by admission of the statement into evidence.

We have stated that "[t]he residual hearsay exception is to be used only rarely, and in exceptional circumstances, and is meant to apply only when certain exceptional guarantees of trustworthiness exist and when high degrees of probativeness and necessity are present." *Bohler-Uddeholm America, Inc. v. Ellwood Group, Inc.*, 247 F.3d 79, 112 (3d Cir. 2001) (internal citations omitted).

The district court viewed the videotape and concluded that the blinks and nods Hodge allegedly made "in response" to the photo array were simply too ambiguous to constitute a meaningful statement. This means that Hodge's response to this array lacked the "circumstantial guarantees of trustworthiness" necessary to be equivalent to those categorized in the exceptions set forth in the hearsay exceptions specified in Rules 803 and 804 of the Federal Rules of Evidence. Accordingly, his response could not meet the requirements embodied in Rule 807.

Lawrence devotes a paragraph of his brief arguing that "the refusal to admit defense evidence tending to inculpate a third party has been found to be reversible error as long as there is some connection between the suspected third party and the crime with which the defendant is charged." Appellant's Brief at 43. Lawrence cites *United States v. Stevens*, 935 F.2d 1380, 1404-05 (3d Cir. 1991); and *Pettijohn v. Hall,* 599 F.2d 476, 478 (1st Cir. 1979) to support that proposition. Both *Stevens* and *Pettijohn* held that a district court's refusal to admit a second identification for the factfinder to compare with a prior identification was reversible error. However, it is not at all clear that Hodge was actually identifying his assailant here. The district court correctly concluded that it was just as likely that Hodge was trying to tell police that "Ogami," whose photograph was included in the first array he was shown, was at the scene when the shooting occurred. Although it may have been preferable for the court to admit that evidence for the jury's consideration, we can not say that the court abused its discretion in not doing so given the strength of the identifications by Harrigan, Frederiksen and Martin, and the ambiguity of Hodge's response.

### 2. Hodge's Statement to His Sister The Day After the Shooting

Lawrence also argues that the district court erred in not admitting testimony by Berenice Hodge about the decedent's statements to her the day after the shooting. He claims that the evidence was admissible as an excited utterance. When Berenice Hodge first saw her brother at the hospital, he was having trouble speaking, but he kept repeating "Ogami" to his sister. When she repeated "Ogami" back to him, he nodded his head "yes." Hodge also said "T" during this exchange.

The district court initially rejected Lawrence's claim of an excited utterance when defense counsel first tried to elicit the testimony during cross-examination of Sergeant Curtis Griffin, asking him if Berenice Hodge identified any suspects during his interview of her. After the government objected, a conference occurred at side bar. R. 774-75A. During that conference the court stated that testimony

regarding what the witness told Berenice Hodge was double hearsay and therefore inadmissible.[7] However, defense counsel contended that the statement should be admitted as an excited utterance. The court rejected the argument. Later, defense counsel tried again to admit this evidence during its case-in-chief. However, the court again rejected the claim explaining: "An excited utterance would be if [the victim] talked to the [police officer at the scene of the shooting] and said, 'So and so shot me.'" The court noted that the statement Lawrence was trying to elicit was a

---

7. The relevant court proceedings were as follows:

Defense counsel: Did you interview the victim's sister —

Sergeant Griffin: Yes.

Defense counsel: — during your investigation?

Sergeant Griffin: Yes.

Defense counsel: And during that interview, did an identified individual named —

Government counsel: Objection, Your Honor.

The Court: All right. Come to side-bar.

(Side-bar discussion)

Defense counsel: Your Honor, it is my intention to elicit from this witness that another person's name was identified in connection to this crime, and not through the photo identification, but through the interview with his sister.

The Court: Where did she get the information?

Defense counsel: She got it from the victim. I'm not going to ask him where she got it from.

Government counsel: That makes it triple hearsay, Judge.

The Court: Double hearsay.

Defense counsel: It is not the individual where the information came from. I don't have to tell where the identified individual —

The Court: You can ask him if he has investigated other suspects. You're not going to get in the back door — the information was hearsay. The name would be definitely hearsay, it seems to me.

R.774A-75A.

statement Hodge made to his sister after he was taken to the hospital. His sister was the first family member to speak with him.

We agree that Hodge's statement to his sister was not an excited utterance under Fed. R. Evid. 803(2). That rule allows hearsay to be admitted as an exception to the hearsay rule if a declarant makes a statement relating to a startling event while under the stress of excitement caused by the event. However, the proffered statement must be made as a result of and while the declarant's utterance is the direct result of the exciting event. *See* Fed R. Evid. 803(2), Advisory Committee's Note. The district court believed that too much time elapsed between the shooting and the subsequent statement at the hospital to allow Hodge's mention of Ogami to qualify as an excited utterance. The fact that Hodge waited until he was speaking to a family member to utter the declaration supports the court's conclusion. It strongly suggests that the statement was more the product of deliberation than an overpowering and exciting event. Had the same statement been uttered to the police at the scene under different circumstances, it may well have constituted an excited utterance. However, that is not what happened. Rather, Hodge waited until the following day before he made the disputed declaration.[8] Accordingly, the district court did not abuse its discretion in refusing to admit it.

It must also be noted that if the court allowed defense counsel to introduce this exchange with Berenice Hodge, the government would have been able to also elicit testimony that Hodge also whispered "T" in the same exchange that he said "Ogami." We fail to see how "Ogami" can qualify as an excited utterance, but not "T." That would open the door to arguing that Hodge was attempting to identify Lawrence. There is evidence that Lawrence is

---

8. We do not, of course, suggest that a statement that otherwise qualifies as an excited utterance exception to the hearsay rule ceases to become admissible simply because it is not made at the scene of the exciting event. However, common sense suggests that the lapse of time, and change of scene is relevant to determining the extent to which a statement is spontaneous or the result of deliberation.

known as "Trini," and "Tall Boy." Given the totality of the evidence here, the jury may well have concluded that Hodge was referring to the defendant when he uttered "T." Accordingly, not only did the district court's ruling not deny Lawrence a fair trial, it is likely that it quite properly closed a door that a skilled prosecutor would otherwise have been likely to walk through.

### 3.  Lawrence's Sixth Amendment Right Was Not Violated

Lawrence also insists that the district court deprived him of his Sixth Amendment right to confront witnesses by excluding any reference to Berenice Hodge's testimony during cross-examination of police officers. Berenice Hodge had told the police that her brother told her about Ogami and "T" being involved. Lawrence argues that he sought to introduce this evidence to contradict the testimony of other government witnesses that only one person was responsible for the fatal shooting. He argues that this testimony might have changed the jury's mind about key government witnesses' credibility, and it should therefore have been admitted.

The Sixth Amendment guarantees a defendant's right to confront witnesses. Cross-examination is an integral part of that right and concomitantly, it is an important ingredient in the fact-finding process. *Davis v. Alaska*, 415 U.S. 308, 315-16 (1974); *Chambers v. Mississippi*, 410 U.S. 284, 295 (1973). Accordingly, significant restrictions on a defendant's cross-examination of witnesses can amount to a violation of the rights guaranteed under the Sixth Amendment. *Chambers*, 410 U.S. at 295. However, the right to cross-examine is neither absolute nor unbounded. Rather, it is "tempered by the practical aspects of conducting a criminal trial," and "a reasonable limitation on cross-examination will [therefore] not necessarily violate the Sixth Amendment." 27 James Wm. Moore et al., Moore's Federal Practice ¶ 643.02 (3d ed. 2003); *see also Chambers*, 410 U.S. at 295.

Moreover, the right to cross-examine does not allow a litigant to elicit testimony that is otherwise inadmissible.

Thus, hearsay evidence is not purged of those qualities that make it hearsay merely because it is elicited on cross-examination as opposed to direct examination. Fed. R. Evid. 802 bars hearsay testimony from trial unless it fits within one of the recognized exceptions that bear sufficient indicia of reliability to merit the fact-finder's consideration. Here, the district court reasonably limited cross-examination of police officers to prevent them from relating that Berenice Hodge had told them about her brother's purported "identification" of "Ogami." Lawrence wanted to use those statements on cross-examination to develop the existence of other suspects to the shooting and thereby challenge the witnesses' stated belief that a single person was responsible for Hodge's death. We have already explained why the district court did not abuse its discretion in precluding Berenice Hodge from testifying about those statements. Her statements to police officers informing them of what her brother said are inadmissible for all the same reasons. In addition, her testimony about what the victim told her constitutes double hearsay and the court correctly concluded that it was not admissible under any exception to the hearsay rule.

## C. The Evidence Was Sufficient to Sustain a Conviction for First Degree Murder

Lawrence contends that the evidence was not sufficient to prove premeditation, and he therefore should not have been convicted of murder in the first degree. The argument is patently frivolous and we need only address it briefly.

14 V.I.C. § 922 defines first degree murder as a deliberate killing with premeditation. A premeditated killing is defined as "one which has been planned and reflected upon by the accused and is committed in a cool state of the blood, not in sudden passion engendered by just cause of provocation." *Government of the Virgin Islands v. Roldan,* 612 F.2d 775, 781 (3d Cir. 1979), *cert. denied,* 446 U.S. 920 (1980) (internal citations omitted). However, premeditation does not "require[] . . . that the accused shall have brooded over his plan to kill or entertained it for any considerable period of time. Although the mental processes involved must take place prior to the killing, a

brief moment of thought may be sufficient to form a fixed, deliberate design to kill." *Id.* Moreover, since it is impossible to photograph the mental processes of a killer, and since it is folly to expect that a killing will be explained by a killer's explanation of any specific intent accompanying the act, circumstantial evidence is usually the only possible proof of the mental processes involved. *Government of the Virgin Islands v. Charles*, 72 F.3d 401, 410 (3d Cir. 1995).

Here, the assailant specifically told Hodge, "It's you I come for," and then shot him three times. One of those bullets struck Hodge in the throat area, and one struck him in the abdomen. Moreover, one of the shots was fired as Hodge was stumbling backward in an apparent attempt to flee. All of the shots were fired at extremely close range from a .38. It can not seriously be argued that a reasonable jury could not have been convinced beyond a reasonable doubt that the shooter intended to kill Hodge given that testimony.

### D. The Evidence Was Sufficient to Prove the Weapon Was a "Firearm"

Lawrence's final contention is that the evidence was insufficient to establish that the weapon involved was a "firearm" for purposes of 18 U.S.C. §§ 922 and 924. He relies on the fact that § 922 specifically excludes firearms manufactured before 1898 from the definition of "firearms" included under §§ 922 and 924. *See* 18 U.S.C. § 921(a)(3), (a)(16) (2003).[9] He notes that, not only did the government

---

9. 18 U.S.C. § 921(a)(3) defines the term "firearm" as it is used in 18 U.S.C. §§ 922 and 924(c) as:

> (A) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (B) the frame or receiver of such a weapon; (C) any firearm muffler or firearm silencer; or (D) any destructive device. *Such term does not include an antique firearm.*

The term "antique firearm," as it is used in 18 U.S.C. § 921(a)(3), is defined in Section 921(a)(16) as:

> (A) *any firearm* (including any firearm with a matchlock, flintlock, percussion cap, or similar type of ignition system) *manufactured in or before 1898;* or

fail to introduce any evidence to establish that the gun that was used was manufactured after 1898, but that the government's own experts specifically acknowledged the possibility that the bullet fragments recovered from the scene were fired by a weapon manufactured before that date. Therefore, says the defendant, his convictions on counts two and three cannot stand.[10]

The government argues that the exception for antique firearms in § 921 does not establish an additional element that it must prove, but instead provides an affirmative defense with the burden of proof on the defendant. Only after the defendant presents some evidence that the firearm was an antique, the government argues, does it have to prove that the firearm was not an antique beyond a reasonable doubt. Here, the defense presented no evidence that the gun in question was an antique beyond raising the *possibility* through the government's experts. Although a fact can certainly be established though cross-examination as opposed to direct testimony, more is required than

---

(B) any replica of any firearm described in subparagraph (A) if such replica—

(I) is not designed or redesigned for using rimfire or conventional centerfire fixed ammunition, or (ii) uses rimfire or conventional centerfire fixed ammunition which is no longer manufactured in the United States and which is not readily available in the ordinary channels of commercial trade; or (C) any muzzle loading rifle, muzzle loading shotgun, or muzzle loading pistol, which is designed to use black powder, or a black powder substitute, and which cannot use fixed ammunition. For purposes of this subparagraph, the term "antique firearm" shall not include any weapon which incorporates a firearm frame or receiver, any firearm which is converted into a muzzle loading weapon, or any muzzle loading weapon which can be readily converted to fire fixed ammunition by replacing the barrel, bolt, breechblock, or any combination thereof.

(emphasis added in both quotes).

10. The government experts testified that the bullet fragments found in Josh Hodge could have been expelled from a number of firearms, including one antique firearm, the Top Break, manufactured by Iver Johnson.

raising the specter of an ephemeral mathematical possibility to create an issue of fact. Thus, the government contends that Lawrence never established the affirmative defense of the date of manufacture for it to rebut.

We agree that the government can not be expected to engage in the litigational equivalent of shadow boxing by jabbing and striking at shadowy inferences that may arise from the ethers of testimony. Yet, Lawrence's position as to the government's burden of establishing the date of manufacture of a weapon that was never recovered would lead us down that road. Every circuit court of appeals that has considered this issue has agreed that establishing that a weapon is an "antique firearm" for purposes of §§ 921 and 922 is an affirmative defense that must initially be raised by sufficient evidence to justify shifting a burden of proof to the government.

In *United States v. Mayo*, 705 F.2d 62, 73-76 (2d Cir. 1983), the court examined the legislative history of § 921(a)(3) and concluded that it allowed a defendant to raise the affirmative defense that he/she used an antique firearm when charged with violating 18 U.S.C. § 922. The court held that this did not create an additional element for the government to prove in order to win a conviction under the applicable statutes. Rather, using the Supreme Court's definition of an affirmative defense as a bar to a crime that "does not serve to negative any facts of the crime," the *Mayo* Court found that the language in § 921 established an affirmative defense because one weapon could satisfy both the broad definition of firearm in § 921(a)(3) as well as the narrow exception for antique firearms in § 921(a)(16). *Id.* at 75 (quoting *Patterson v. New York*, 432 U.S. 197, 206-07 (1977)). This legislative scheme reflects Congress's policy of controlling the traffic in firearms, which is "a significant factor in the prevalence of lawlessness and violent crime in the United States." *Id.* at 75-76 (internal citations omitted). Yet, in enacting this scheme, Congress clearly did not want to penalize or burden legitimate collectors of firearms or restrict their access to valuable antiques. However, requiring the government to prove that a given weapon was manufactured after a given date when the weapon has not been recovered would make law

enforcement more difficult and thwart the policy of controlling the illegal firearms market. *Id.* at 76.

The court in *United States v. Laroche*, 723 F.2d 1541, 1543 (11th Cir. 1984) reached the same conclusion. There, Laroche challenged his convictions under §§ 922 and 924 because the government failed to prove that the firearms involved were not antique firearms as defined by § 921. He claimed this statutory exception was an element of the offense that the government was required to disprove. *Id.* The court disagreed and followed the analysis of *Mayo* instead. *See also U.S. v. Williams*, 979 F.2d 186, 187 (11th Cir. 1992) (per curiam) (stating that the antique weapons exception in § 921 is an affirmative defense that must be raised by the defendant before the burden of disproving an antique weapon shifts to the government, citing *Laroche*).

The Court of Appeals for the Sixth Circuit followed *Laroche* and *Mayo* in *United States v. Smith*, 981 F.2d 887, 891-92 (6th Cir. 1992). There the court held that the defense contained in § 921 was an affirmative one that is waived if not raised by the defendant. Since Smith had not raised that defense at either his plea or sentencing, the court held that he had waived it and the government was under no obligation to establish that the weapon involved was manufactured after 1898.

These cases were followed by the Court of Appeals for the Eighth Circuit in *United States v. Washington*, 17 F.3d 230, 232 (8th Cir. 1994). The court there concluded that the government did not have to establish that the weapon involved was manufactured after 1898 because the defendant presented no evidence about this issue. *Id.*

We agree. Based on the text of the statute, and the Congress's purpose of deterring trafficking in firearms while protecting the interests of legitimate antique weapons collectors, we hold that the exemption for antique firearms contained in § 921(a)(16) is an affirmative defense that must be raised by defendant and supported by some evidence before the government has to prove the contrary beyond a reasonable doubt.

Here, Lawrence established only the *possibility* that the firearm that fired the bullets that killed Hodge could have

been manufactured before 1898. Since it was never recovered, there was no way of determining when it was manufactured. Accordingly, the evidence established only that the gun was manufactured at some point before it was used to kill Hodge; that is hardly a remarkable revelation. However, there was no evidence to suggest that the firearm actually was manufactured before 1898. This was not enough to carry his burden of raising the affirmative defense, which requires "sufficient evidence to raise the exception as an issue." *Laroche*, 723 F.2d at 1543; *see also U.S. v. Washington*, 17 F.3d at 232. Accordingly, we hold that the evidence was sufficient to sustain his convictions under counts two and three of the indictment.

## Conclusion

For the reasons set forth above, we will affirm the judgment of the District Court.

A True Copy:
 Teste:

*Clerk of the United States Court of Appeals*
*for the Third Circuit*