**UNITED STATES of America**

v.

**Ephraim BARR.**

**Criminal No. 05–0347.**

United States District Court,
E.D. Pennsylvania.

Sept. 28, 2006.

Mary E. Crawley, U.S. Attorney's Office, Philadelphia, PA, for United States of America.

*MOTION TO SUPPRESS EVIDENCE*
*FINDINGS OF FACT AND*
*CONCLUSIONS OF LAW*

RUFE, District Judge.

The eight-count indictment in this matter charges that Defendant Ephraim Barr committed and conspired to commit identity theft and other acts of fraud. Defendant has filed a conclusory and bare-bones motion that seeks to suppress a number of pretrial identifications, statements, and pieces of evidence. Upon consideration of Defendant's Combined Motion to Suppress Physical Evidence, Statements, and Identification, and the Government's Response thereto, and after a three-day evidentiary hearing, the Court enters the following findings of fact and conclusions of law:

### FINDINGS OF FACT

**I. Thomas Somerville Incident**

1. Patrolman Jason Yaletchko currently works for the Upper Chichester Township Police Department in Delaware County, Pennsylvania. He has more than ten years of law-enforcement experience.

2. On December 16, 2002, Patrolman Yaletchko received a report from Ray Mikell, branch manager of the Boothwyn branch of the Thomas Somerville Company, that someone had passed a fraudulent check at the branch on November 21, 2002.

3. Mikell told Patrolman Yaletchko that the suspect was a smaller-framed black male, 6′1″ tall, in his mid—to late-thirties, and that the suspect arrived at the store driving a dark green Ford Excursion with Pennsylvania tags. Another employee of the store had recorded the Pennsylvania tag as # ETT 1337 and informed Patrolman Yaletchko of that fact.

4. Patrolman Yaletchko ran the Pennsylvania tag and learned that the vehicle was registered to Hertz Rental at the Philadelphia International Airport.

5. Patrolman Yaletchko contacted a manager at Hertz Rental, who informed him that on November 21, 2006, the green Ford Excursion bearing Pennsylvania license plate # ETT1337 was rented to an Ephraim Barr of 2129 Mountain Street, Philadelphia, Pennsylvania.

6. Upon running a criminal-history report for Ephraim Barr, Patrolman Yaletchko learned that Barr had

been involved in numerous thefts in the Philadelphia area, as well as in Delaware, Maryland, and New Jersey.

7. Based on the above information, on December 18, 2002, Patrolman Yaletchko, with the help of a Pennsylvania State trooper, assembled a photo lineup [1] using the C–PIN system.[2]

8. The photo lineup assembled by Patrolman Yaletchko contained eight head shots of black males with similar facial features, hair, and skin tone. Defendant's photo was located in the upper-left corner of the lineup, or the "first position."

9. Later on December 18, 2002, Patrolman Yaletchko showed the photo lineup to Robert Suydam, an employee of the Boothwyn branch of Thomas Somerville. Patrolman Yaletchko sat down with Suydam in the office area of the store, advised him that the suspect's photo may not be in the lineup, and instructed him to place a check mark and his name next to the photo of anyone he may recognize. No one else was present during this process.

10. Suydam identified the photo of Defendant within ten seconds, placed

an "X" in the upper-left-hand corner of the photo, and wrote his signature, the date, and the time at the top of the photo.

11. Patrolman Yaletchko also intended to show the photo lineup to another store employee, Timothy Holmes, on December 18, but Holmes was not at work that day. Accordingly, Patrolman Yaletchko instructed Suydam not to discuss the photo lineup with Holmes before Holmes had an opportunity to view it.

12. The following day, December 19, 2002, Patrolman Yaletchko returned to the Boothwyn branch of Thomas Somerville and showed the photo lineup to Holmes. Patrolman Yaletchko sat down with Holmes outside the presence of others, advised him that the suspect's photo may not be in the lineup, and instructed him to place a check mark and his name next to the photo of anyone he may recognize.

13. Holmes immediately identified the photo of Defendant, placed an "X" in the upper-left-hand corner of the photo, and wrote his signature, the

1. As a preliminary matter, it is appropriate to define some key terms as used by the Court throughout these Findings of Fact and Conclusions of Law. A "photo lineup" is an arrangement of photographs of individuals, all with similar physical attributes, shown to a witness to determine whether the suspect can be identified as the perpetrator. The photographs of individuals who are not suspects are chosen based solely on physical characteristics with the intent of including those that most closely match the suspect's attributes. A "photo display" is an arrangement of photographs of individuals, each of whom is a potential suspect and none of whom is necessarily similar in physical attributes to the others, shown to a witness to determine whether any or all of them can be identified as the

perpetrator or perpetrators. Finally, a "photo array" is a term that includes any arrangement of photographs for identification purposes; both a "photo lineup" and a "photo display" would be considered a "photo array."

2. The C–PIN system is a statewide database containing photos and arrest records of suspects arrested in Pennsylvania. An officer can input a suspect for purposes of creating a photo array, and the system will automatically select photos of individuals who look similar to the target suspect. The officer may then manually select photos from the computer-generated pool for inclusion in the photo array.

date, and the time at the top of the photo.

14. No evidence suggests that Suydam and Holmes discussed the photo lineup prior to Holmes's positive identification.

15. Based on these positive identifications, Patrolman Yaletchko swore out an affidavit of probable cause and obtained a warrant to arrest Defendant.

## II. Duron Paints Incident

16. Corporal Robert Harris Truitt currently works for the Delaware State Police. He has worked there for approximately seventeen-and-one-half years.

17. In late May 2003, Corporal Truitt was assigned to investigate a report from Melissa Schwartzman, an employee in the security department of Duron Paints, located at 1712 Newport Gap Pike, Wilmington, Delaware, that someone had passed a fraudulent check at the store on April 17, 2003. Schwartzman gave Corporal Truitt a black-and-white surveillance video of the incident.

18. At the start of his investigation, Corporal Truitt spoke with Duron Paints employee Neil Bukay, who had helped the suspect load items purchased with the fraudulent check into the suspect's car on April 17.

19. Bukay told Corporal Truitt that the suspect was a tall, well-spoken black male, in his twenties to thirties, with a dark complexion, shortly cropped hair, and eyeglasses. He also said that the suspect drove an older model dark-green or teal Ford Explorer with Pennsylvania tag # EJW–2154.

20. Corporal Truitt ran the tag and learned that the vehicle was registered to an Ephraim Barr of 2129 Mountain Street, Philadelphia, Pennsylvania.

21. Upon running a criminal-history report for Ephraim Barr, Corporal Truitt learned that Barr had been arrested previously in Delaware.

22. Based on the above information, Corporal Truitt prepared a photo lineup using an automated computer system called Print Track.

23. The photo lineup prepared by Corporal Truitt contained six color head shots of black males with similar facial features, hair, and skin tone. Defendant's photo was located in the bottom-right corner, or the "sixth position."

24. On May 27, 2003, Corporal Truitt showed the photo lineup to Kenneth Shell, a Duron Paints employee who was working on the day of the incident, in the manager's office of the store. Corporal Truitt told Shell to take his time in reviewing the lineup and that the suspect's photo may not be included. No one else was present during this process.

25. Shell verbally identified the photo of Defendant within seconds. He did not memorialize his identification on the photo lineup or in any other form. After making the identification, Shell also noted that the suspect was well-spoken.

26. The following day, May 28, 2003, Corporal Truitt returned to Duron Paints and showed the same photo lineup to Bukay in the manager's office of the store. Corporal Truitt gave the same instructions to Bukay that he had previously given to Shell. No one else was present during this process.

27. Bukay verbally identified the photo of Defendant immediately. He did not memorialize his identification on the photo lineup or in any other form.

28. Corporal Truitt did not believe that Shell or Bukay had access to or viewed the surveillance video provided by Schwartzman prior to making their identifications.

29. Based on both positive identifications, Corporal Truitt requested and obtained an arrest warrant for Defendant.

### III. Rexel Company Incident

30. Officer Brian J. Fraim is a patrol officer for the Baltimore County, Maryland, Police Department and is currently assigned to the Cockeysville Precinct. He has worked there for four years.

31. On January 16, 2003, Officer Fraim went to the Rexel Company, located at 21 Fontana Lane, Baltimore, Maryland, to investigate a report that someone had purchased items from the store using a fraudulent check on January 13, 2003.

32. Officer Fraim first spoke with Harold Skinner of Rexel. Skinner told Officer Fraim that Detective Allen Elverson of the Upper Merion Township Police Department called him with information that a black male named Ephraim Barr, born May 12, 1971, had been stopped in Pennsylvania and items from Rexel had been found inside Barr's vehicle.

33. Skinner also told Officer Fraim that the items in Barr's vehicle were the same items bought from Rexel on January 13, 2003, by a black male using a suspicious check.

34. Based on this information, Officer Fraim checked Ephraim Barr's criminal history and learned that Barr had been arrested previously, and that his photograph was on file with Baltimore County's BOOKEM system.

35. Officer Fraim prepared a photo lineup using the computerized booking system by inputting descriptors—e.g.: height, weight, skin color, hair color and length—from Barr's photo and having the system generate a pool of photos that closely matched his photo. The system accesses "thousands upon thousands"[3] of photos to generate the matching pool. Officer Fraim then reviewed the automatically generated photos to select the best matches for inclusion in the photo lineup.

36. The photo lineup prepared by Officer Fraim contained six head shots of black males with similar facial features, hair, and skin tone. Defendant's photo was located in the bottom middle, or the "fifth position."

37. On February 6, 2003, Officer Fraim showed the photo lineup to Skinner at the counter near the entrance of Rexel. Officer Fraim told Skinner to identify anyone he may recognize from the January 13 incident and that the suspect's photo may not be in the lineup. No one else was present during this process.

38. Skinner identified the photo of Defendant in ten to fifteen seconds, saying, "Looks a little different, but that's him."[4] Skinner and Officer

---

3. N.T. Suppression Hr'g 7/12/06 at 75:14–15. 4. *Id.* at 77:15–16.

Fraim memorialized the positive identification by writing their signatures, the date, and the time on the photo lineup.

39. Based on the positive identification, Officer Fraim requested and obtained an arrest warrant for Defendant.

## IV. Billows Electric Supply Company Incident

40. Special Agent Kyung J. Kim currently works for the Federal Bureau of Investigation ("FBI") in New York. Prior to joining the FBI and during the time of the events involved in this case, Agent Kim was a detective for the Philadelphia Police Department for six years.

41. In the spring of 2002, Agent Kim was investigating a credit-card identity-theft case involving numerous victims enrolled at the University of Pennsylvania School of Medicine. He was assisted in his investigation by Detective Jane Curry of the University of Pennsylvania Police Department.

42. On April 17, 2002, Agent Kim learned from Hilton Jones, the manager of Billows Electric Supply, located at 9100 State Road, Philadelphia, Pennsylvania, that one of the fraudulent credit cards involved in his investigation had been used to purchase items at the store on April 1, 2002.

43. Jones told Agent Kim that the suspect was a black male, approximately 6'0" to 6'2" tall, and between thirty and forty years old, and that he had arrived at the store in a blue minivan.

44. On May 8, 2002, Agent Kim obtained a search warrant to search the address where the credit card used at Billows Electric was issued.

The address was a two-story rowhouse located at 2129 Mountain Street, Philadelphia, Pennsylvania.

45. Agent Kim performed a search of 2129 Mountain Street on May 9, 2002, at approximately 7:00 a.m. Inside the house, Agent Kim found a Baltimore County Detention Center identification card containing Defendant's name and photo, and a pre-approved credit application in the name of one of the identity-theft victims.

46. Later on May 9, 2002, Agent Kim prepared a photo lineup using a computerized system. The system automatically generated more than one hundred photos that matched the description of Defendant's photo. Agent Kim then manually selected photos that most closely matched Defendant's photo for inclusion in the photo lineup.

47. The photo lineup prepared by Agent Kim contained eight black-and-white photos of black males with similar facial features, hair, and skin tone. Defendant's photo was located in the bottom-right corner, or the "eighth position."

48. The same day Agent Kim prepared the photo lineup, he showed it to Damian Anderson, a Billows Electric employee who had helped the suspect who used the fraudulent credit card on April 1. Agent Kim showed Anderson the photo lineup inside the Billows Electric store, instructing him to take his time reviewing the photos and advising him that the suspect's photo may not be there. No one else was present during this process.

49. Anderson immediately identified the photo of Defendant. He signed

and dated below the photo to memorialize his positive identification.

### V. Universal Supply Company Incident

50. On May 14, 2002, Detective Curry followed a lead at Universal Supply Company, located at Route 130 South, Gloucester City, New Jersey. Denny Salvano, assistant branch manager at Universal Supply, had informed Detective Curry that two black males driving a blue Ford van with Pennsylvania tag # YJM3973 attempted to buy items using a suspicious check bearing the name "Catherine Whang." Agent Kim had found a pre-approved credit-card application in the name "Catherine Whang" at 2129 Mountain Street.

51. One of the suspects wore rectangular glasses, and the other was in his fifties. The suspect with the rectangular glasses presented the suspicious check to salesman Ed Taylor. Salvano, who had been informed of a similar incident at another store in the same industry as Universal Supply, confronted the suspects and informed them that the check would have to be verified or they would have to pay in cash. The suspects then left the store with the check and drove away in their van.

52. Agent Kim ran the Pennsylvania tag of the van and learned it was registered to Defendant.

53. On May 15, 2002, Agent Kim and Detective Curry showed a photo lineup to Salvano and Taylor separately. The photo lineup contained the same eight photos as that prepared by Agent Kim on May 9, but the photos were arranged differently. Agent Kim explained that he altered the arrangement of the photos to ensure that any identifications by Salvano and Taylor were not influenced by anyone else. In the photo lineup shown to Salvano and Taylor, Defendant's photo was located in the "second position."

54. Agent Kim and Detective Curry first showed the photo lineup to Salvano. They told him to take his time and see if he recognized anyone, and that the suspect's photo may not be included. No one else was present during this process.

55. Salvano identified the photo of Defendant within thirty seconds. At Agent Kim's request, Salvano signed and dated above the photo to memorialize his identification.

56. Agent Kim and Detective Curry then showed another copy of the photo lineup to Taylor. They repeated the same instructions they had given to Salvano. No one else was present during this process.

57. Taylor identified the photo of Defendant within thirty seconds. At Agent Kim's request, Taylor signed and dated above the photo to memorialize his identification.

58. Based on all of the above information, Agent Kim obtained a warrant to arrest Defendant.

59. Agent Kim arrested Defendant on August 6, 2002, at approximately 7:15 p.m.

60. At the interrogation room of the South Detective Division, Agent Kim interviewed Defendant and obtained his statement. The interrogation room is approximately nine feet by five feet with a single light, a desk, three or four chairs, a telephone, and a trash can. Agent Kim was sitting across the desk from Defendant throughout the in-

terview, and he was unarmed. No one else was present.

61. Before beginning the interview, he advised Defendant of his constitutional rights by reading them from a form and providing Defendant a copy of that form to follow along.[5]

62. Agent Kim asked if Defendant understood all of his rights by reading from page two of the form given to Defendant. After each question, Defendant provided his answer. Defendant's written responses demonstrate that he understood all of his rights, did not want to remain silent, did not want to talk to a lawyer before the interview or have a lawyer present for the interview, and was willing to answer questions voluntarily and without coercion. Defendant signed and dated the bottom of page two in the presence of Agent Kim.

63. According to Agent Kim, Defendant appeared to understand what he was being told about his constitutional rights and the interview process. Defendant did not appear ill or under the influence of alcohol. Defendant also appeared to have the ability to read and write in English.

64. Agent Kim made no promises to Defendant, nor did he threaten him prior to taking his statement.

65. After Agent Kim advised Defendant of his rights and confirmed that Defendant wished to proceed with the interview, he asked Defendant questions about his involvement in the crimes under investigation. Defendant invoked his Fifth Amendment right not to testify in response to certain questions, but not as to the interview as a whole. Defendant never asked Agent Kim to stop the interview.

66. Defendant then gave a statement, which Agent Kim summarized on three handwritten pages accompanying the warnings form that Defendant had signed. Agent Kim did not record every answer given verbally by Defendant during the interview.

67. The entire interview process, including warnings and Defendant's statement, lasted between forty-five minutes and one hour.

## VI. Allentown Service Plaza Incident

68. Pennsylvania State Trooper Richard J. Brannigan works for the Pennsylvania State Police and currently patrols an eighty-mile area from the Allentown Service Plaza (the "Plaza") to the Clark Summit Interchange. He has been a state trooper for twelve years.

69. On September 24, 2004, Trooper Brannigan responded to a report that three individuals attempted to use a fraudulent $100 Visa traveler's check bearing the name "Don-

---

5. The warnings on the form appear as follows:

We have a duty to explain to you and to warn you that you have the following legal rights:

A. You have the right to remain silent and do not have to say anything at all.

B. Anything you say can and will be used against you in Court.

C. You have a right to talk to a lawyer of your own choice before we ask you any questions, and also to have a lawyer here with you while we ask questions.

D. If you cannot afford a lawyer, and you want one, we will see that you have a lawyer provided to you, free of charge, before we ask you any questions.

E. If you are willing to give us a statement, you have a right to stop any time you wish.

ald Jones" at the Pizza Hut Express located in the Plaza.

70. Upon arriving at the Plaza, Trooper Brannigan spoke with Crystal Rivera, an assistant manager at the Plaza.

71. Rivera described the suspects as two black males and one black female. She said one of the male suspects was tall and wore a Hawaiian shirt. The other male suspect was shorter and wore glasses. Rivera did not remember anything about the female suspect other than her race.

72. Rivera said that the restaurant had received a similar counterfeit traveler's check about a month earlier, so the restaurant employees were suspicious when the three individuals presented the $100 check. The employees notified Rivera about the suspicious check. Subsequently, Rivera confronted the three suspects and told them that she had to call the police because the check "didn't look right." [6] Rivera told the suspects to wait at the Pizza Hut Express until the police arrived.

73. Rivera walked from the Pizza Hut Express to the Roy Rogers cash register to call the police. The taller male suspect with the Hawaiian shirt accompanied her and waited nearby as she spoke to the police.

74. Trooper Brannigan also spoke with another assistant manager, Darryl George. George told Trooper Brannigan that the suspects drove a blue Dodge Caravan and provided Trooper Brannigan with the registration number of the vehicle.

75. Trooper Brannigan ran the registration number and learned that the vehicle was a blue Dodge Caravan owned by Dollar Rent a Car.

76. Trooper Brannigan called Dollar Rent a Car and discovered that, at the time of the incident, the van was rented to a Linda Brown and an Ephraim Barr.

77. On September 25, 2004, Trooper Brannigan ran those names through JNET, a computer network that stores drivers' information, history, and license photos. He obtained JNET photos of both individuals.

78. Trooper Brannigan also ran the name Donald Jones in JNET, which showed a cancelled Delaware license that came back to a Douglas Caldwell. Trooper Brannigan ran the name Douglas Caldwell in JNET and obtained Pennsylvania driver's-license photos for two different individuals with that name.

79. Trooper Brannigan printed the photos of Brown, Barr, and the two Caldwells, and arranged them on a single page. Defendant's photo was located in the upper-left corner of the display.

80. Trooper Brannigan asked a co-worker, Trooper Keith R. McCauley, to take the photo display to the Plaza and show it to Rivera.

81. On September 25, 2004, Trooper McCauley met with Rivera at the Plaza. He asked her to review the photographs and identify anyone she recognized as being involved in the previous day's fraudulent-traveler's-check incident. Other people were in the vicinity, but the conversation between Trooper McCauley and Rivera was conducted privately.

6. N.T. Suppression Hr'g 7/31/06 at 40:8.

82. Rivera identified the photo of Defendant. Trooper McCauley memorialized her identification by writing Rivera's name and contact information next to the photograph of Defendant.

83. Rivera also positively identified the Defendant on the store's video-surveillance footage of the September 24 incident, though the record is unclear whether she did so in the presence of Trooper McCauley or Trooper Brannigan.

84. Trooper McCauley later told Trooper Brannigan that Rivera had identified the Defendant.

85. Thereafter, Trooper Brannigan created a photo lineup of individuals who looked similar to Barr. The photo lineup consisted of seven photos of black males with short hair and facial hair. Trooper Brannigan selected the photos in the lineup by manually reviewing photos in JNET for an hour and selecting the ones that best matched Barr's photo. Defendant's photo was located in the "fifth position" in the photo lineup.

86. On October 2, 2004, Trooper Brannigan showed the photo lineup to Rivera in the basement of the Plaza. He asked her to look through the photos and identify anyone who was involved in the September 24 incident. No one else was present during this process.

87. Rivera verbally identified the photo of Defendant. She did not memorialize her identification. Trooper Brannigan did not prompt Rivera to select Defendant's photo over any of the other photos.

88. After speaking with Rivera, Trooper Brannigan went to the Sunoco gas station at the Plaza. Trooper McCauley was investigating a separate incident of a fraudulent traveler's check being used at the Sunoco on August 20, 2004, and he thought that the Sunoco incident may have been related to the Pizza Hut Express incident.

89. Trooper Brannigan spoke with two Sunoco cashiers, Erin Perkins and Emily Mitchell, about the August 20 incident. He learned that a black male attempted to pay for gas with a suspicious $100 Visa Traveler's Check.

90. Trooper Brannigan showed the same photo lineup that he had shown to Crystal Rivera to Perkins and Mitchell separately.

91. Perkins immediately identified Defendant by pointing to Defendant's photo and saying that he was the individual involved in the August 20 incident. She did not memorialize her identification.

92. Mitchell also quickly identified Defendant by pointing to Defendant's photo and saying that he was the individual involved in the August 20 incident. She did not memorialize her identification.

93. Based on the identifications by Rivera, Perkins, and Mitchell, along with other information obtained in his investigation, Trooper Brannigan filed charges against Defendant. Those charges were eventually withdrawn in favor of the instant federal prosecution.

## VII. Fromm Electric Supply Incident

94. Detective Joseph P. Kelly, Jr. works for the Souderton Police Department in Montgomery County, Pennsylvania. He has worked there for twenty years and has been a detective for thirteen years.

95. In January 2003, Detective Kelly began investigating allegations of fraud at Fromm Electric Supply, located at 16 Washington Avenue, Souderton, Pennsylvania.

96. On January 22, 2003, at approximately 2:41 p.m., Detective Kelly spoke with Lou Fromm of Fromm Electric. Fromm informed him that a thin-built black male, about 5'11' tall, and in his early thirties, purchased items from the store on December 26, 2002, using a fraudulent check. Fromm also said that the suspect drove a red or brown pickup truck.

97. Fromm provided Detective Kelly with a copy of the fraudulent check. The check had a Pennsylvania driver's-license number and a date of birth written on it, but there was no record on file with the Pennsylvania Department of Transportation associated with that number and date of birth.

98. Detective Kelly placed a memorandum regarding the details of his investigation of the Fromm Electric incident in the Montgomery County Bulletin.

99. Detective Elverson of the Upper Merion Township Police Department contacted Detective Kelly and informed him that he was conducting a similar investigation. Detective Elverson also said that he had arrested Defendant in the course of his investigation, and that Defendant drove a red pickup truck.

100. On January 28, 2003, after learning about Defendant from Detective Elverson, Detective Kelly asked the booking clerk for the Towamencin Township Police Department to prepare a photo line-up that included a photo of Defendant. The Souderton Police Department uses the Towamencin Township Police Department for the preparation of photo lineups because it has access to photographs of every person arrested in Pennsylvania.

101. The photo lineup prepared by the booking clerk contained eight head shots of black males with similar short hair, facial hair, and skin tone. Defendant's photo was located in the "fifth position."

102. In the early afternoon on January 28, 2003, Detective Kelly went to Fromm Electric in Souderton to show the photo lineup to three employees: Lou Fromm, Carol Lucier, and Dean Booz. Detective Kelly met with each employee separately and outside the presence of anyone else.

103. Detective Kelly met first with Fromm in his office. He read Fromm a form describing the procedure for viewing the photo lineup and provided Fromm a copy of the form. He then showed Fromm the lineup. Fromm identified Defendant within ten minutes by placing an "X" next to the photo in the fifth position and writing, "Picked up material at our counter w/ bad check."[7] Fromm also initialed and dated the photo lineup to verify that it was the one he used to identify Defendant.

104. Detective Kelly next met with Lucier at her desk and followed the same procedure he used with Fromm. Lucier identified Defendant and another person within

7. N.T. Suppression Hr'g 7/31/06 at 10:17–18.

five minutes by placing an "X" next to both the photo in the fifth position and that in the second position, and writing, "These 2 people remind me of what I can remember about the person who was here. More towards number five." [8] Lucier initialed and dated the photo lineup to verify it was the one she used to make the identifications. She also noted that when she talked to the suspect on December 26, he mentioned that he was going to be donating a kidney to his mother.

105. Detective Kelly then met with Booz at his desk and followed the same procedure described above. Booz identified Defendant within five minutes by placing an "X" next to number five and writing, "Had minor conversation about working life." [9]

106. In the course of speaking with Fromm, Detective Kelly learned that a fraudulent check also had been passed at another Fromm Electric store, located at 356 High Street, Pottstown, Pennsylvania, on January 10, 2003.

107. Detective Kelly asked the booking clerk to prepare another photo lineup (the "second photo lineup") using the same photos from the first photo lineup but arranged in a different order. The Defendant's photo was located in the "second position" in the second photo lineup.

108. On January 30, 2003, Detective Kelly went to Fromm Electric in Pottstown to show the second photo lineup to two employees: Gary Rhoads and Charly Johnson.

Rhoads had received the fraudulent check, and Johnson had spoken with the suspect who passed the check. He met with Rhoads and Johnson separately.

109. Detective Kelly first met with Rhoads at the counter of the store. Johnson was about five feet away but did not participate in the conversation. Detective Kelly administered the photo lineup using the same procedure he had used with the Souderton employees. Detective Kelly did not say or do anything to influence Rhoads's review of the photo lineup.

110. Rhoads was unable to identify anyone. He memorialized his failure to identify anyone by checking the box next to "After viewing the photo array, I did not recognize anyone in the arrangement." [10] Rhoads also wrote his signature, the date, and the time on the bottom of the form, and Detective Kelly signed the bottom of the form.

111. Detective Kelly next met with Johnson at the counter of the store. Rhoads was about five feet away but did not participate in the conversation. Detective Kelly administered the photo lineup using the same procedure he had used with the Souderton location employees and Rhoads. Detective Kelly did not say or do anything to influence Johnson's review of the photo lineup.

112. Johnson identified Defendant within two minutes by placing an "X" next to number two and writing, "Came into the store to buy

---

**8.** *Id.* at 12:4–5.

**9.** *Id.* at 13:1–2.

**10.** Gov't Ex. 2JK at 2.

material on January 10." Johnson also wrote his signature, the date, and the time on the bottom of the form, and Detective Kelly signed the bottom of the form.

113. Based on these identifications and other information obtained during his investigation, Detective Kelly obtained a warrant for Defendant's arrest.

## VIII. The Ferguson Enterprises Incident

114. On January 15, 2003, Detective Elverson of the Upper Merion Township Police Department became involved in an investigation of fraud at Ferguson Enterprises, a plumbing-supply company located at 302 Hansen Access Road, King of Prussia, Pennsylvania.

115. That day, Detective Elverson heard a call being dispatched over the police radio about a counterfeit check that two men had passed at Ferguson Enterprises.

116. The patrol officers on the scene of the Ferguson incident contacted Elverson for advice. They told him that, based on the report of a Ferguson employee, the suspect drove a green 2000 Ford Expedition that was loaded with other merchandise, including plumbing and electrical supplies from Rexel in Maryland. The Ferguson employee had also called Rexel and verified that the merchandise was recently purchased with a counterfeit check.

117. The patrol officers had arrested Defendant, who had initially identified himself as "Harry Long," in connection with the incident. The check passed at Ferguson was drafted on the account of "Long Construction" and signed for by "Harry Long."

118. Detective Elverson instructed the patrol officers to impound the green Expedition and transport it to the Upper Merion Police Department's garage. Officer Glen Mutzer of the Upper Merion Township Police Department signed an internal form authorizing the impoundment of the vehicle.

119. Defendant was transported to the Upper Merion Township police station. Detective Elverson met with Defendant after he had been in the cellblock for about an hour. Detective Elverson introduced himself as the detective investigating the Ferguson incident and asked Defendant if he wanted to talk about anything. Defendant said he did wish to talk, and he was cooperative.

120. Detective Elverson, who was unarmed, proceeded to initiate an interview of Defendant. Detective Elverson left the cellblock, obtained and filled out a *Miranda* rights form and a consent-to-search form, and returned to the cellblock.

121. Detective Elverson read the *Miranda* rights form to Defendant.[11]

---

**11.** The portion read to Defendant appears as follows:

I have been advised;
1. Of my right to remain silent and that anything I say can and will be used against me in a Court of Law;

2. that I have a right to talk to an attorney before I am questioned and to have him present during questioning;
3. that, if I cannot afford an attorney, one will be provided to me without costs prior to any questioning;

After Detective Elverson read the question, "With these Miranda rights in mind, are you still willing to talk with us and give us a voluntary statement?" Defendant answered, "Yes."[12] Detective Elverson then gave the form to Defendant to review. Defendant reviewed the form, signed it in Detective Elverson's presence, and returned it to Detective Elverson. Defendant did not, however, write answers in the spaces below the questions about whether he understood the *Miranda* rights read and explained to him and whether he was still willing to provide a statement.

122. Detective Elverson next read the consent-to-search form to Defendant. The consent-to-search form contained an explicit authorization for Detective Elverson to search Defendant's green 2000 Ford Expedition, VIN # 1 FMPU1 8LOY-LA56453, which was located in the Upper Merion Police Department's garage. After Detective Elverson finished reading the form to Defendant, he asked Defendant to review it. Defendant did so and signed the form in the detective's presence.

123. According to Detective Eleverson, Defendant appeared alert and physically healthy while both forms were read to him.

124. Detective Elverson and his partner took Defendant to their office, where the three talked for approximately twenty minutes. The office is approximately ten feet by twenty feet with two desks, a window, and a couple of chairs. Defendant was not handcuffed or shackled during the interview.

125. Defendant admitted that he knew the check used at Ferguson was bad, and stated that he was paid $100 by someone else to use the check to pickup merchandise. He also admitted that he owned the Expedition and had previously owned a red pickup truck. He stated that he had previously carried out similar fraudulent-check schemes at a Home Depot. He stated that he operated these schemes for a living, and offered to help the police catch other people who use counterfeit checks.

126. Defendant declined Detective Elverson's request to put his statement in writing.

127. Pursuant to the consent-to-search form signed by Defendant, the officers searched the Expedition. Inside, they found merchandise from the Rexel Company.

128. Thereafter, Detective Elverson spoke with various other law-enforcement officials about Defendant. He advised Officer Yaletchko, who had placed a warrant in NCIC about two weeks prior, that Defendant was in custody. He spoke with Detective Kelly in response to a request by the Souderton Police Department for information on similar fraudulent-check crimes.

129. Based on his investigation, Detective Elverson filed charges against Defendant.

---

4. that, during questioning, I have the right to refuse to answer any questions and that I may stop talking anytime I wish.

Q. Do you understand your Miranda rights that were read and explained to you?

**12.** N.T. Suppression Hr'g 7/31/06 at 94:5–8.

## IX. The May 10, 2003 Traffic Stop and Search of Defendant's Vehicle

130. Officer Robert John Cashen, Jr. works for the Maryland Transportation Authority Police Department. He has worked there for nine years.

131. On May 10, 2003, Officer Cashen was assigned to the specialized Homeland Enforcement and Traffic Unit, which uses unmarked cars to patrol the highway for aggressive driving and other criminal activity.

132. At approximately 12:21 p.m. that day, Officer Cashen observed Defendant speeding on Interstate 95 in a green Ford Expedition. Officer Cashen and Defendant were both driving northbound on Interstate 95, and Officer Cashen's initial visual estimate was that Defendant was driving approximately eighty miles per hour. Using same-direction-moving radar, Officer Cashen clocked Defendant driving seventy-seven miles per hour in a fifty-five-mile-per-hour zone.

133. Officer Cashen stopped Defendant's vehicle; both vehicles pulled onto the right shoulder of the highway. When Officer Cashen stepped out of his car and approached Defendant's Expedition, he noticed Defendant hanging out of the window and complaining about why he had been stopped. Defendant was alone in his Expedition.

134. Defendant produced a Pennsylvania driver's license in his name and proof of registration. Officer Cashen ran Defendant's information through NCIC. He learned that Defendant had outstanding arrest warrants for fraud in Baltimore County, Maryland. Officer Cashen waited for backup to arrive.

135. Once a backup unit arrived, Officer Cashen arrested Defendant, placed him in his patrol car, and searched Defendant's Expedition incident to the arrest. Officer Cashen found large amounts of newly purchased items in the trunk of the Expedition, such as electrical goods, car parts, and tools. Officer Cashen also found a receipt from the Rexel Company, an electric-supply store located at 601 Chinquapin Round Road, Annapolis, Maryland, for the purchase of some of the items in the trunk.

136. While transporting Defendant to the police station, Officer Cashen called the phone number on the Rexel receipt. He spoke with Mr. Mogeld, a Rexel salesperson, who said that earlier he had served a black male matching Defendant's description. The customer had produced a Delaware identification card and paid with a check. On the check, he wrote his date of birth as May 12, 1970, and also wrote the identification number from the Delaware card.

137. In a subsequent call, Mogeld informed Officer Cashen that the check presented by the suspect was bad. Based on the above information, and knowing that Defendant's birthday is May 12, 1971, Officer Cashen began to suspect that Defendant was the person who passed the bad check at Rexel.

138. When Officer Cashen returned to the station and secured Defendant, he and another officer con-

ducted an inventory of Defendant's Expedition. Under the headliner in the windshield, the officers found a Delaware identification card bearing the name "Daniel Barrison" and a photo of Defendant. The number of the identification card matched the number on the bad check used to purchase items at Rexel. A search of the information on the Delaware identification card revealed no such person.

139. On the passenger side of Defendant's Expedition, the officers found a New York identification card bearing the name "Tanya Johnson." A search for a New York identification card bearing that name revealed no such person. Officer Cashen said the laminate on the card suggested it was a fake.

140. The station-house search of the car revealed items from two other businesses in Annapolis, Maryland—the Noland Company and Sheehy Lexus—and a piece of paper with handwritten names in which Home Depot accounts had been opened.

141. At approximately 7:38 p.m. on May 10, 2003, Officer Cashen observed Secret Service Agent Thomas M. Gurn and Detective Sergeant Manny Crew interview Defendant.

142. The interview took place in the station-house cafeteria, located down the hall from the cell block. The cafeteria is a large room with a couch, vending machines, a water cooler, a refrigerator, a television, and many tables and chairs. Officer Cashen, Agent Gurn, Detective Sergeant Crew, and Defendant were the only people in the cafeteria during the interview. Defendant was not handcuffed.

143. Agent Gurn began the interview by reading Defendant his constitutional rights from a form. Defendant signed and dated the form to indicate that he had been advised of and understood his rights. Agent Gurn and Detective Sergeant Crew attested to Defendant's signature by signing their own signatures on the form. According to Officer Cashen, Defendant appeared to understand his rights and appeared eager to go forward with the interview.

144. Defendant gave an oral statement in which he discussed how he acquired the items in his Expedition, the person in charge of the fraudulent-identification-card ring, his role in opening the Home Depot accounts, and other matters.

145. When Defendant had finished his oral statement, Agent Gurn asked Defendant if he would put a statement in writing. Defendant agreed and wrote a brief paragraph on the warnings form he had signed earlier. Defendant's written statement omitted several of the things he had said in his oral statement.

146. Although Defendant's written statement was not as detailed as his oral statement, none of the interviewing officers asked him follow-up questions or urged him to provide a more detailed written statement.

147. The entire interview lasted between fifteen and twenty minutes.

148. At no point during the interview did the officers make promises to or threaten Defendant. Officer Cashen said that Defendant was

willing to help them because "his mother was in dire straits, that she needed a kidney transplant and that he was the donor, that he had a wife and kids he was trying to raise properly ... [and][n]ow he wants to get out of the game...."[13]

149. Officer Cashen does not recall if the investigators discussed with Defendant whether his cooperation with law enforcement would affect any subsequent criminal prosecution of Defendant.

## X. The February 7, 2005 Traffic Stop and Subsequent Searches

150. Officer Gregory Stevens and Officer Glenn Kenan are partners in the Philadelphia Police Department. Officer Stevens has been on the force for seven years, and Officer Kenan for nineteen years.

151. During daylight hours on February 7, 2005, Officer Stevens and Officer Kenan, along with Officer Wells, were on patrol in an unmarked vehicle when they saw Defendant driving a Ford Expedition near Nineteenth Street and Christian Street in Philadelphia. The officers were traveling northbound when they saw Defendant's Expedition, traveling westbound, pass through the intersection in front of them.

152. Officer Kenan has known Defendant for fifteen years, having arrested him in the past.

153. At the time he was on patrol on February 7, Officer Kenan was aware that Defendant was wanted on an active arrest warrant from Lancaster County for fraud and/or credit-card theft. Officer Kenan had the Lancaster County warrant with him in the unmarked patrol car that day. Based on the warrant, Officer Kenan and Officer Stevens stopped Defendant's Expedition and arrested Defendant. No one else was in the Expedition with Defendant.

154. The officers searched Defendant and found over $1400 in cash, traveler's checks, and receipts from Lowe's, Best Buy, and Sears stores located in the Roanoke, Virginia, area.

155. The officers also noticed that Defendant's Expedition was loaded with brand new, packaged merchandise, such as tools, door handles, and wiring.

156. The officers brought Defendant to the Seventeenth Police District station for processing. They also drove Defendant's Expedition to the station because the vehicle was stopped in a high-crime area and contained suspicious merchandise.

157. Immediately after entering the station house and while still in the processing area, Defendant blurted out various statements.

158. According to Officer Stevens, Defendant said: " '[The] cops are too stupid to catch him, district magistrates just throw this stuff out anyway and that it's not like he's killed any—anybody, he's not stealing—and he's not stealing money from me.' "[14] Officer Kenan memorialized Defendant's statements in an interview with the detective investigating the case.

---

**13.** N.T. Suppression Hr'g 07/13/06 at 61:19–22.

**14.** N.T. Suppression Hr'g 7/12/06 at 100:22–25.

159. According to Officer Kenan, Defendant said something to the effect of, "I can't get in trouble, because I don't sign for anything," [15] or, "You're not going to get me this time. . . . I don't sign for anything, my lawyer told me not to sign for nothing." [16]

160. Neither Officer Stevens nor Officer Kenan asked Defendant any questions other than general questions about his name, address, and other background information.

161. At the station house, the police searched Defendant's Expedition and seized many of the items they found inside. They did not obtain a warrant before conducting the search.

162. Officer Kenan called the loss-prevention offices of the stores whose receipts were found on Defendant and whose merchandise was found in Defendant's vehicle.

163. At some point while at the station house, Defendant asked Officer Kenan to contact his son's mother, Tameka Nash, and tell her where she should pick up their son. Defendant provided Nash's cell-phone number and an address where she could be found. Officer Kenan was unable to reach Nash on her cell phone, so he, Officer Stevens, and Officer Wells went to the address, 1839 McCallum Street in Philadelphia, that Defendant had provided for her.

164. Meanwhile, Defendant was taken to the First District station house, where a constable from Lancaster County picked him up.

165. Officer Kenan, Officer Stevens, and Officer Wells arrived at 1839 McCallum Street at approximately 4:00 or 4:30 p.m., while it was still light outside. Officer Kenan knocked on the door, but no one answered. He then looked through the window to the right of the door. The blinds near the bottom of the window were bent open, providing an open view into the house from the outside. None of the officers touched the window or the blinds to gain a better vantage point.

166. Standing outside and looking through the window, the officers saw unopened boxes of new merchandise. Some of the boxes matched boxes the officers had found in Defendant's Expedition.

167. A U–Haul truck was parked on the south side of the street approximately two houses away from the front of 1839 McCallum Street. Officer Stevens ran the tag information for the U–Haul truck and learned that it had been rented out of Virginia. He then contacted U–Haul in Virginia and learned that the truck was rented to an Elizabeth Atterbury, a Virginia resident, and was supposed to have been returned on February 5, 2005. Officer Stevens advised U–Haul that if they placed the truck on "stolen status," he would recover it for them. He subsequently called for a marked police car to "hold" [17] the house and the U–Haul truck.

15. *Id.* 158:16–17.

16. *Id.* 164:17–18.

17. According to Officer Stevens, "holding" means an officer monitored the house and truck so that no one could access them without authorization nor remove potential evidence. *See* N.T. Suppression Hr'g 7/12/06 at 109:16–18.

168. On February 8, 2005, the officers who had arrested Defendant spoke with Detective Frank Straup of the Philadelphia Police Department, South Detective Division. Detective Straup is assigned to fraud cases and has twenty-five years of experience with the South Detective Division.

169. Based on his conversation with the arresting officers and his review of a memorandum prepared by the arresting officers, Detective Straup initiated an investigation of Defendant for possible fraud. Among other things, Detective Straup talked to loss-prevention representatives at Lowe's, Best Buy, and Sears. One of those representatives had reviewed a store surveillance tape that showed the suspects as a well-dressed black male and a black female.

170. Detective Straup discovered that kitchen cabinets listed on the Lowe's receipt found in Defendant's possession matched boxes of kitchen cabinets observed inside 1839 McCallum Street.

171. Detective Straup also discovered that the name on the U–Haul reservation, Elizabeth Atterbury, matched the name on the Sears receipt found in Defendant's possession. Detective Straup called Elizabeth Atterbury, who told him that at the time the Sears purchases and U–Haul rental occurred, she was hospitalized at the University of Pennsylvania Hospital. She also said she did not authorize those transactions.

172. As a result of his investigation, Detective Straup applied for and obtained warrants to search the two-story brick row house located at 1839 McCallum Street and the U–Haul truck parked outside for stolen items, including the items that appeared on the receipts seized from Defendant at the time of his arrest on February 7.

173. Detective Straup and his lieutenant executed the search of 1839 McCallum Street on February 11, 2005, at approximately 2:00 p.m. They seized a number of items, which Detective Straup recorded on the face of the search warrant and later recorded in greater detail on a personal notepad. One of the items that officers found inside the house was the key to the U–Haul truck.

174. Detective Straup had the U–Haul truck towed to the police garage. On February 15, 2005, at approximately 4:05 p.m., he conducted a search of the truck in the police garage. He inventoried a number of items, which he recorded on the face of the search warrant.

## XI. The March 23, 2005 Traffic Stop and Search of Defendant's Vehicle

175. Officer Michael Palmer has been an officer with the Philadelphia Police, First District, for three-and-a-half years.

176. On March 23, 2005, Officer Palmer was assigned to patrol the area bounded by Eighteenth Street to Twenty–Second Street and Moore Street to Snyder Avenue in a marked car. At approximately 2:00 p.m., in light rain, he saw Defendant, driving a green 2000 Ford Expedition with Pennsylvania tags, run a red light at Nineteenth Street and Snyder Avenue. Officer Palmer stopped the Expe-

dition near the 2000 block of Snyder Avenue.

177. As Officer Palmer approached the Expedition, Defendant appeared nervous and was waving his hands out the window. Defendant told Officer Palmer he was in a rush to get home because his father was sick.

178. Officer Palmer took Defendant's license, registration, and insurance information back to his patrol car and ran it through his police computer. He also notified police radio to run Defendant's information for any outstanding warrants. The radio dispatcher confirmed that there was an active warrant for Defendant's arrest issued out of Delaware County, Pennsylvania.

179. Officer Stevens responded to the scene after hearing Officer Palmer's report of the traffic stop and request for information regarding Defendant over the radio. When Officer Stevens arrived, Officer Palmer was taking Defendant into custody. Officer Stevens checked Defendant's Expedition and found, in the backseat, an identification card bearing the name "Carmella Bayne." In the front of the vehicle, he found printouts of Mapquest directions to and from different locations.

180. Officer Stevens recognized the locations in the printouts as various stores, including a Best Buy, in the Pittsburgh area. Some of the printouts also contained handwritten notes that read "base," "back to base," "Best," and "go home." [18]

181. Officer Stevens gave the identification card and printouts to Detective Straup for further investigation.

## DISCUSSION

### I. Identifications

The admissibility of pretrial photographic identifications is determined by applying the two-pronged *Simmons/Stovall* inquiry.[19] The Court must first determine whether the identification procedure was unnecessarily or impermissibly suggestive.[20] If this first prong is satisfied, the Court must then determine "whether the procedure was so 'conducive to … mistaken identification' or gave rise to such a 'substantial likelihood of … misidentification' that admitting the identification would be a denial of due process."[21] In doing so, the Court must consider the "totality of the circumstances"[22] to determine whether the identification "possesses sufficient aspects of reliability"[23] that it should, nonetheless, be admitted. To determine whether the identification is reliable, the Court must consider factors including:

**18.** N.T. Suppression Hr'g 7/12/06 at 113:23–25 & 114:1–9.

**19.** *Simmons v. United States*, 390 U.S. 377, 383, 88 S.Ct. 967, 19 L.Ed.2d 1247 (1968); *Stovall v. Denno*, 388 U.S. 293, 302, 87 S.Ct. 1967, 18 L.Ed.2d 1199 (1967).

**20.** *United States v. Stevens*, 935 F.2d 1380, 1389 (3d Cir.1991). This first prong contains two parts: (1) whether the procedure was suggestive at all; and (2) if so, whether there was some good reason for the failure to resort

to less suggestive procedures. *Id.* Defendant bears the burden of proving this first prong. *United States v. Lawrence*, 349 F.3d 109, 115 (3d Cir.2003).

**21.** *See Stevens*, 935 F.2d at 1389 (quoting *Simmons*, 390 U.S. at 384, 88 S.Ct. 967).

**22.** *Neil v. Biggers*, 409 U.S. 188, 199, 93 S.Ct. 375, 34 L.Ed.2d 401 (1972).

**23.** *Manson v. Brathwaite*, 432 U.S. 98, 106, 97 S.Ct. 2243, 53 L.Ed.2d 140 (1977).

(1) the opportunity of the witness to view the criminal at the time of the crime; (2) the witness' degree of attention; (3) the accuracy of the witness' prior description of the criminal; (4) the level of certainty demonstrated by the witness at the confrontation; and (5) the length of time between the crime and confrontation.[24]

Defendant's Motion to Suppress merely requested a hearing to determine whether any of his constitutional rights were violated by the identification procedures at issue, and the evidence presented at that hearing does not demonstrate that any of those procedures were sufficiently improper to warrant their suppression.

## A. Photographic Lineups[25]

■ Defendant has not shown that any of the photo lineups in this case were unnecessarily suggestive. The testimony of those officers who administered the challenged photo lineups, as well as the actual photo lineups entered into evidence by the government, establish that the lineups were neutrally created and presented and were not unnecessarily suggestive by unduly singling out Defendant.

The photo lineups themselves were not suggestive because they contained photos of individuals with similar facial features, hairstyles, and skin tone as Defendant. The photos were either carefully chosen by officers in an attempt to closely match Defendant's physical attributes or generated by a sophisticated computer program. All included photos were mug-shot-style head shots, and Defendant's photo was not brighter, clearer, or in any other way distinct from the other photos included in the photo lineups.

■ Furthermore, the procedures used by the officers to present the photo lineups were in no way suggestive: all of the officers showed the photo lineups in one-on-one settings, outside the presence of others, and none of the officers influenced the witnesses' identification of Defendant. Defendant has not presented any evidence or even offered any explanation to show how the various photo lineups were inherently suggestive or administered in a manner that was unnecessarily suggestive. As a result, the Court is not required to inquire further into the reliability of these identifications. Thus, the identification evidence relating to the administration of photo lineups is admissible at trial.

## B. Photographic Display

■ The photographic display created by Trooper Brannigan and administered by Trooper McCauley presents a slightly more complicated issue than the photo lineups. The display was created to determine if Defendant was one of the actors involved in the September 24, 2004 incident. Accordingly, the administration of the four-photo display was an investigatory technique more analogous to a photographic "show-up" than a photo lineup. As Trooper Brannigan testified, the photo display was compiled as quickly as possible and taken to Ms. Rivera immediately thereafter,[26] and, unlike the photo lineups, there was no effort made to include unrelated photos of individuals with similar physical characteristics. These facts, how-

---

**24.** *United States v. Brownlee,* 454 F.3d 131, 139 (3d Cir.2006) (citing *Biggers,* 409 U.S. at 199–200, 93 S.Ct. 375).

**25.** The photo lineups include all of those photographic displays administered other than

the four-photo display initially shown to Crystal Rivera related to the September 24, 2004 incident at the Allentown Service Plaza.

**26.** N.T. Suppression Hr'g 7/13/06 at 84:21–24.

ever, do not render Rivera's initial identification inadmissible.

While the photo display may be considered suggestive, Rivera's identification would be inadmissible only if, considering the totality of the circumstances, the identification is unreliable [27]—that is, if it is "so conducive to . . . mistaken identification or gave rise to such a substantial likelihood of . . . misidentification that admitting the identification would be a denial of due process." [28] Upon consideration of the factors articulated in *Neil v. Biggers*,[29] the Court finds that Rivera's identification of Defendant using the four-photo display "possesses sufficient aspects of reliability" to be admitted against Defendant at trial. First, Rivera had more than ample opportunity to view Defendant at the time of the incident: she interacted directly with Defendant as she explained to him and his accomplices that she would have to notify the state police, she was followed by Defendant to the phone when she went to place the call, and she personally returned the traveler's check to Defendant after he demanded its return.[30] Second, as evidenced by her July 31, 2006, testimony, Rivera paid close attention to the events of September 24, 2004, noticing details about Defendant's appearance and demeanor.[31] Third, Rivera was absolute in her identification of Defendant when presented with the photo display; she testified that she was "a hundred percent" certain about her identification [32] and she later identified Defendant two additional times.[33] Finally, Rivera's identification of Defendant using the four-photo display took place only one day after the alleged incident occurred.[34] Such a short length of time between the alleged crime and the identification suggests that the identification is reliable despite the potential suggestiveness of the photo display.

The Court therefore finds that Rivera's identification using the four-photo display is admissible because, even if the display may be considered suggestive, the identification possesses sufficient aspects of reliability so as not to deny Defendant his due process. While Defendant is free to attack the weight of Rivera's initial identification using the photo display, the Court, after careful consideration, will not suppress her identification.

## II. Searches and Seizures

There are six searches at issue in Defendant's Motion to Suppress: four separate searches of Defendant's vehicle, the search of the townhouse at 1839 McCallum Street, and the search of the U–Haul truck. Defendant seeks to suppress all evidence obtained from those searches under the exclusionary rule. However, with the exception of the May 10, 2003 search of his vehicle by Officer Cashen and the search of 1839 McCallum Street, Defendant's Motion to Suppress does not explain how the other searches and seizures violated his Fourth Amendment rights. Although Defendant has made little effort to explain to the Court why certain searches and seizures were unconstitutional, the Court will nonetheless analyze all six

---

27. *See Stevens*, 935 F.2d at 1389

28. *Id.* (internal quotations omitted).

29. 409 U.S. at 199–200, 93 S.Ct. 375; *see also Brownlee*, 454 F.3d at 139 (illustrating the Third Circuit's adoption of the reliability factors articulated in *Biggers*); *supra* text accompanying note 24.

30. N.T. Suppression Hr'g 7/31/06 at 40–44.

31. *See, e.g., id.* at 39–44.

32. *Id.* at 47:17–21.

33. *Id.* at 43:18–25, 46:8–18, 46–47:22–12.

34. *Id.* at 42:7–9.

searches under prevailing Fourth Amendment jurisprudence.

 a defendant seeking to suppress evidence bears the initial burden of proof that the search and seizure was unlawful.[35] But, once the defendant establishes a basis for his or her motion, by showing that the search was performed without a warrant or pursuant to a tainted warrant, for example, the burden shifts to the government to show by a preponderance of evidence that the search was lawful.[36] The government can meet this burden by proving either that the search was conducted pursuant to a valid warrant or that the search or seizure was reasonable under an exception to the Fourth Amendment's warrant requirement.[37]

## A. Searches of Defendant's Vehicles

Defendant invokes a somewhat lengthy and convoluted argument that the searches of Defendant's vehicles were not permitted under the rationale of *Terry v. Ohio*.[38] While this assertion may or may not be true, it is irrelevant because two exceptions to the warrant requirement, other than the "stop-and-frisk" exception created in *Terry*, are applicable in this case: first, the search-incident-to-arrest exception; and second, the consent exception. The evidence offered by the government sufficiently rebuts Defendant's claim that the searches were illegal warrantless searches.

### 1. Search–Incident–to–Arrest Exception

██ Under the search-incident-to-arrest exception to the warrant requirement, the police may search a vehicle's passenger compartment incident to a lawful arrest, even where the police do not make contact with the person arrested until he or she has already left the vehicle.[39] The validity of the search turns on the validity of the arrest itself.[40]

██ Accordingly, the May 10, 2003 search of Defendant's Expedition was constitutional because it occurred incident to Defendant's valid arrest. After Officer Cashen lawfully stopped Defendant for violating the posted speed limit, he discovered that Defendant was wanted on an active arrest warrant and arrested him pursuant to that warrant. The arrest based on an outstanding arrest warrant was a lawful arrest, and Officer Cashen's search of Defendant's Expedition occurred subsequent to the arrest. As a result, the search did not require an independent search warrant, and the evidence seized is admissible at trial.

Similarly, the March 23, 2005 search of Defendant's Expedition was constitutional because it occurred incident to Defendant's valid arrest. After Officer Palmer lawfully stopped Defendant for failing to obey a traffic signal, he discovered that Defendant was wanted on an active arrest warrant out of Delaware County, Pennsylva-

35. *United States v. Johnson*, 63 F.3d 242, 245 (3d Cir.1995) (citing *United States v. Acosta*, 965 F.2d 1248, 1256 n. 9 (3d Cir.1992)).

36. *See id.*

37. *Id.*

38. 392 U.S. 1, 88 S.Ct. 1868, 20 L.Ed.2d 889 (1968).

39. *Thornton v. United States*, 541 U.S. 615, 623–24, 124 S.Ct. 2127, 158 L.Ed.2d 905

(2004); *New York v. Belton*, 453 U.S. 454, 460, 101 S.Ct. 2860, 69 L.Ed.2d 768 (1981).

40. *See Beck v. Ohio*, 379 U.S. 89, 91, 85 S.Ct. 223, 13 L.Ed.2d 142 (1964) ("The constitutional validity of the search in this case, then, must depend upon the constitutional validity of the petitioner's arrest."). Accordingly, if the arrest of a suspect is lawful, pursuant to an active warrant for example, the search of the suspect's vehicle incident to that arrest is constitutional.

nia, and arrested him pursuant to that warrant. The Expedition was searched upon Defendant's arrest based on the outstanding warrant. As a result, the search did not require an independent search warrant, and the evidence seized is admissible at trial.

Likewise, the February 7, 2005 search of Defendant's Expedition was constitutional because it occurred incident to Defendant's valid arrest pursuant to an active warrant out of Lancaster County, Pennsylvania. Officer Kenan, who has known Defendant for fifteen years, recognized Defendant in his car and knew that Defendant was wanted on the active warrant. Officer Kenan performed a lawful traffic stop based on this information,[41] arrested Defendant pursuant to the active warrant, and then searched the vehicle. As a result, the search did not require an independent search warrant, and the evidence seized is admissible at trial.

### 2. Consent–to–Search Exception

Under the consent-to-search exception, the government may search without a warrant if the individual whose person or property is to be searched gives his consent.[42] Consent is valid so long as it is given voluntarily.[43]

■ Applying these principles, the January 15, 2003 search of Defendant's Expedition was constitutional because Defendant expressly consented to it: he signed a written consent-to-search form after Detective Elverson advised him of his rights. All of the offered evidence indicates that Defendant voluntarily signed the consent-to-search form and, as a result, Officer Elverson's search of Defendant's vehicle was permissible. As a result, the search did not require an independent search warrant, and the evidence seized is admissible at trial.

### B. Searches of the 1839 McCallum Street Residence and the U–Haul Truck

■ A search conducted pursuant to a valid search warrant is, of course, constitutional, and evidence obtained during the search is admissible. While a valid search warrant cannot issue based solely on information obtained during an illegal search,[44] one can be issued based on information gained during a valid plain-view search because that information is not illegally obtained.[45]

■ Under the plain-view exception to the warrant requirement, police officers

---

**41.** *See United States v. Sokolow*, 490 U.S. 1, 7, 109 S.Ct. 1581, 104 L.Ed.2d 1 (1989) (citing *Terry*, 392 U.S. at 30, 88 S.Ct. 1868). "[T]he police can stop and briefly detain a person for investigative purposes if the officer has a reasonable suspicion supported by articulable facts that criminal activity 'may be afoot,' even if the officer lacks probable cause." *Id.* Furthermore, "a stop to check a driver's license and registration is constitutional when it is based on an 'articulable and reasonable suspicion that ... either the vehicle or an occupant' has violated the law." *Johnson*, 63 F.3d at 245 (quoting *Delaware v. Prouse*, 440 U.S. 648, 663, 99 S.Ct. 1391, 59 L.Ed.2d 660 (1979)). Accordingly, Officer Kenan, who recognized Defendant as a person wanted on an outstanding arrest warrant based on a violation of law, was permitted to stop Defen-

dant's vehicle. After Officer Kenan positively identified Defendant, he made a valid arrest pursuant to the outstanding arrest warrant, and the search of Defendant's vehicle was incident to that arrest, and not based solely on the initial traffic stop.

**42.** *See Schneckloth v. Bustamonte*, 412 U.S. 218, 219, 93 S.Ct. 2041, 36 L.Ed.2d 854 (1973).

**43.** *See id.* at 222, 93 S.Ct. 2041 (internal quotations omitted).

**44.** *See United States v. Perez*, 280 F.3d 318, 340 (3d Cir.2002) (citing to *United States v. Restrepo*, 966 F.2d 964, 970 (5th Cir.1992)).

**45.** *See id.* at 339–40.

may obtain information without a warrant if their plain-view observations are made while officers are lawfully on the premises.[46] While the Fourth Amendment protects both the home and the curtilage,[47] which includes the front yard of a residence,[48] "[o]fficers are allowed to knock on a residence's door or otherwise approach the residence seeking to speak to the inhabitants just as any private citizen may." [49] "Where officers are pursuing a lawful objective, unconnected to any search for the fruits and instrumentalities of criminal activity, their entry into the curtilage after not receiving an answer at the front door might be reasonable[,] as entry into the curtilage may provide the only practicable way of attempting to contact the resident. . . ." [50]

■ Defendant contends that the February 11, 2005 search of 1839 McCallum Street was unconstitutional because the warrant authorizing that search was obtained based on observations that allegedly violated the Fourth Amendment. Specifically, Defendant argues that the observations made from the yard and front steps through the window of the residence by Officers Kenan, Stevens, and Wells on February 7, 2005, were unlawful.

The Court disagrees and finds that the searches of the residence at 1839 McCallum Street and the U–Haul parked outside the residence, and the seizure of items pursuant to those searches, were constitutional. The officers lawfully entered the curtilage of the 1839 McCallum Street residence on February 7. The evidence establishes, by a preponderance, that the officers were present at the residence for a

legitimate purpose: they sought merely to find Defendant's son's mother, Tameka Nash, and inform her of Defendant and their child's whereabouts. Indeed, there is no evidence supporting the notion that the officers visited 1839 McCallum Street to search for items in connection with Defendant's alleged fraud. Defendant asked Officer Kenan to notify Nash that he was being arrested and that she needed to pick up their child from daycare. The evidence shows that the officers' visit to 1839 McCallum was undertaken in order to accomplish that task, not to investigate the crime. Moreover, to the extent Defendant specifically asked Officer Kenan to contact Nash by phone or in person, the Court finds that he consented to the officers' entry onto the curtilage of 1839 McCallum Street. Under either approach, the officers were lawfully present when they viewed the stolen merchandise, the existence of which formed the basis for the search warrant later obtained by Detective Straup.

Therefore, the search of 1839 McCallum Street conducted on February 11, 2005, pursuant to a valid search warrant was not tainted by the observations made on February 7. The information upon which the search warrant was based was not illegally obtained and, thus, the search warrant was not tainted. The items seized pursuant to the search warrant are admissible at trial.

Likewise, the search of the U–Haul truck conducted on February 15, 2005, pursuant to a warrant was not tainted by the February 7 observations. The search warrant was issued upon probable cause obtained by simply inquiring into the own-

46. See *Horton v. California*, 496 U.S. 128, 136, 110 S.Ct. 2301, 110 L.Ed.2d 112 (1990).

47. "Curtilage" is defined as: "The land or yard adjoining a house, usually within an enclosure." *Black's Law Dictionary* 411 (8th ed.2004).

48. See *Oliver v. United States*, 466 U.S. 170, 104 S.Ct. 1735, 80 L.Ed.2d 214 (1984).

49. *Estate of Smith v. Marasco*, 318 F.3d 497, 519 (3d Cir.2003).

50. *Id.* at 520.

ership and control of a vehicle parked on a public street combined with the lawful plain-view observations made by officers at the residence. The warrant was in no way tainted by the conduct of police officers at the scene on February 7. Consequently, the items seized pursuant to the search warrant are admissible at trial.

## III. Statements

Defendant seeks to suppress the following four statements: (1) his statement to Agent Kim on August 6, 2002; (2) his statement to Detective Elverson on January 15, 2003; (3) his statement to Agent Gurn on May 10, 2003; and (4) his statements to officers of the Philadelphia Police Department on February 7, 2005.[51]

To defeat Defendant's Motion to Suppress these statements, the government must prove by a preponderance of the evidence that Defendant made those statements voluntarily or in response to custodial interrogation after validly waiving his *Miranda* rights. To establish valid waiver, the Government must show: (1) that the relinquishment of the defendant's rights was voluntary; and (2) that the defendant was fully aware that he was waiving his rights and of the consequence of such waiver.[52] The Court's evaluation of whether valid waiver occurred is highly contextual and must consider the entire course of conduct by the police in obtaining the statement.[53]

▇▇▇▇ In this case, Defendant's statements on August 6, 2002, and January 15,

2003, were made after he validly waived his *Miranda* rights in writing. Similarly, Defendant's statement on May 10, 2003, was made following a valid, oral waiver of his *Miranda* rights.[54] The Court finds that Defendant relinquished his rights voluntarily and with full awareness of his actions. There is no evidence that Defendant was threatened or forced to waive his rights by any of the officers involved, or that the circumstances surrounding his waiver render it involuntary. To the contrary, the evidence shows that Defendant was questioned in safe and secure locations, was fully apprised of his rights, and was even anxious to cooperate with and assist the officers in apprehending others operating fraudulent schemes.

▇▇▇▇ Furthermore, Defendant's statement on February 7, 2005, made while he was still being processed and before any custodial interrogation commenced, was made voluntarily and not in response to any questions or other interrogation. At the time of the statement, officers were simply acquiring Defendant's personal information, as opposed to engaging in an interrogation. The Court finds that, contrary to Defendant's claim that he made the statement in response to interrogation by Officer Kenan, Defendant voluntarily "blurted out" the statement before a custodial interrogation commenced. Moreover, contrary to Defendant's assertion, the statement may not be suppressed as the fruit of an illegal search because the

---

**51.** Defendant's Memorandum in Support of the Motion to Suppress does not make any specific factual assertions or legal arguments explaining why these statements should be suppressed, but rather, simply claims that the statements were taken in violation of *Miranda* and Defendant's Fifth Amendment rights. *See* Combined Mot. to Suppress Physical Evidence, Statements and Identification 10. Nonetheless, the Court finds that Defendant's

statements should not be suppressed under any legal theory.

**52.** *See Moran v. Burbine*, 475 U.S. 412, 421, 106 S.Ct. 1135, 89 L.Ed.2d 410 (1986).

**53.** *Id.*

**54.** Valid waiver of *Miranda* rights does not require a written memorialization of such waiver to be effective.

search in question was lawful, as explained above.

Therefore, the Court declines to suppress any of Defendant's statements.

## CONCLUSIONS OF LAW

1. The procedure used by Officer Yaletchko to obtain Suydam's positive identification of Defendant was constitutional because the photo lineup contained photos of eight males with similar physical attributes and was presented by Officer Yaletchko in a manner that was not unnecessarily suggestive. Suydam's pretrial identification is therefore admissible at trial.

2. The procedure used by Officer Yaletchko to obtain Holmes's positive identification of Defendant was constitutional because the photo lineup contained photos of eight males with similar physical attributes and was presented by Officer Yaletchko in a manner that was not unnecessarily suggestive. Holmes's pretrial identification is therefore admissible at trial.

3. The procedure used by Corporal Truitt to obtain Shell's positive identification of Defendant was constitutional because the photo lineup contained photos of six males with similar physical attributes and was presented by Corporal Truitt in a manner that was not unnecessarily suggestive. Shell's positive identification is therefore admissible at trial.

4. The procedure used by Corporal Truitt to obtain Bukay's positive identification of Defendant was constitutional because the photo lineup contained photos of six males with similar physical attributes and was presented by Corporal Truitt in a manner that was not unnecessarily suggestive. Bukay's positive identification is therefore admissible at trial.

5. The procedure used by Officer Fraim to obtain Skinner's positive identification of Defendant was constitutional because the photo lineup contained photos of six males with similar physical attributes and was presented by Officer Fraim in a manner that was not unnecessarily suggestive. Skinner's positive identification is therefore admissible at trial.

6. The procedure used by Agent Kim to obtain Anderson's positive identification of Defendant was constitutional because the photo lineup contained photos of eight males with similar physical attributes and was presented by Agent Kim in a manner that was not unnecessarily suggestive. Anderson's positive identification is therefore admissible at trial.

7. The procedure used by Agent Kim to obtain Salvano's positive identification of Defendant was constitutional because the photo lineup contained photos of eight males with similar physical attributes and was presented by Agent Kim in a manner that was not unnecessarily suggestive. Furthermore, Agent Kim rearranged the photos so that Anderson's previous identification would not influence Salvano. Salvano's positive identification is therefore admissible at trial.

8. The procedure used by Agent Kim to obtain Taylor's positive identification of Defendant was constitutional because the photo lineup contained photos of eight males with similar physical attributes and was presented by Agent Kim in a manner that was not unnecessarily suggestive. Furthermore, Agent Kim rearranged the photos so that Anderson's previous identification would not influence Taylor. Taylor's positive identification is therefore admissible at trial.

9. Even if the procedure used by Trooper Brannigan and Trooper McCauley to obtain Rivera's initial positive identification of Defendant on the four-photo display may be considered suggestive, the identification possesses sufficient aspects of reliability such that its admission does not deny Defendant his due-process rights. Likewise, Rivera's subsequent positive identifi-

cation of Defendant using the traditional photo lineup, even if the procedure may be considered suggestive as a result of her previously viewing the four-photo display, is sufficiently reliable to be admitted. Rivera's positive identifications are therefore admissible at trial.

10. The procedure used by Trooper Brannigan to obtain Perkins's positive identification of Defendant was constitutional because the photo lineup contained photos of seven males with similar physical attributes and was presented by Trooper Brannigan in a manner that was not unnecessarily suggestive. Perkins's positive identification is therefore admissible at trial.

11. The procedure used by Trooper Brannigan to obtain Mitchell's positive identification of Defendant was constitutional because the photo lineup contained photos of seven males with similar physical attributes and was presented by Trooper Brannigan in a manner that was not unnecessarily suggestive. Mitchell's positive identification is therefore admissible at trial.

12. The procedure used by Detective Kelly to obtain Fromm's positive identification of Defendant was constitutional because the photo lineup contained photos of eight males with similar physical attributes and was presented by Detective Kelly in a manner that was not unnecessarily suggestive. Fromm's positive identification is therefore admissible at trial.

13. The procedure used by Detective Kelly to obtain Lucier's positive identification of Defendant was constitutional because the photo lineup contained photos of eight males with similar physical attributes and was presented by Detective Kelly in a manner that was not unnecessarily suggestive. Lucier's positive identification is therefore admissible at trial.

14. The procedure used by Detective Kelly to obtain Booz's positive identifica-

tion of Defendant was constitutional because the photo lineup contained photos of eight males with similar physical attributes and was presented by Detective Kelly in a manner that was not unnecessarily suggestive. Booz's positive identification is therefore admissible at trial.

15. The procedure used by Detective Kelly to obtain Johnson's positive identification of Defendant was constitutional because the photo lineup contained photos of eight males with similar physical attributes and was presented by Detective Kelly in a manner that was not unnecessarily suggestive. Johnson's positive identification is therefore admissible at trial.

16. The January 15, 2003 search of Defendant's vehicle occurred after he voluntarily consented to the search by signing a consent-to-search form that authorized Detective Elverson to search Defendant's Expedition. The search was therefore constitutional and any items seized are admissible at trial.

17. The May 10, 2003 search of Defendant's vehicle occurred after he was lawfully stopped for exceeding the posted speed limit and incident to a valid arrest based on an active arrest warrant out of Baltimore County, Maryland. The search was therefore constitutional and any items seized are admissible at trial.

18. The March 23, 2005, search of Defendant's vehicle occurred after he was lawfully stopped for failing to obey a traffic signal and incident to a valid arrest based on an active arrest warrant out of Delaware County, Pennsylvania. The search was therefore constitutional and any items seized are admissible at trial.

19. The February 7, 2005 search of Defendant's vehicle occurred after he was lawfully stopped on Officer Kenan's reasonable suspicion and incident to a valid arrest based on an active warrant out of

Lancaster County, Pennsylvania. The search was therefore constitutional and any items seized are admissible at trial.

20. The February 11, 2005 search of 1839 McCallum Street was performed pursuant to a valid search warrant issued upon probable cause based on information obtained through plain-view observations made by officers while lawfully present at the residence to notify Defendant's son's mother of his and their child's whereabouts. The search was therefore constitutional and any items seized are admissible at trial.

21. The February 15, 2005 search of the U–Haul truck was performed pursuant to a valid search warrant issued upon probable cause based on information obtained through plain-view observations made by officers while lawfully present at the residence to notify Defendant's son's mother of his and their child's whereabouts, and information gained by simply inquiring into the ownership and possession of a vehicle parked on a public street in which Defendant had no reasonable expectation of privacy. The search was therefore constitutional and any items seized are admissible at trial.

22. Defendant's statements on August 6, 2002, and January 15, 2003, were made after Defendant was provided with the *Miranda* warnings and voluntarily waived his *Miranda* rights in writing. The statements are therefore admissible at trial.

23. Defendant's statements on May 10, 2003, were made after Defendant was provided with the *Miranda* warnings and voluntarily waived his *Miranda* rights orally. The statements are therefore admissible at trial.

24. Defendant's statements on February 7, 2005, were made voluntarily, before any custodial interrogation commenced, and not in response to any questioning about the alleged crimes. The statements are therefore admissible at trial.

## *ORDER*

**AND NOW,** this 28th day of September 2006, upon consideration of Defendant's Combined Motion to Suppress Physical Evidence, Statements and Identification (Doc. # 83), the United States' Response (Doc. # 93), and the evidence presented at a three-day evidentiary hearing, it is hereby **ORDERED** that Defendant's Motion is **DENIED** in whole.

It is so **ORDERED.**